336 So.2d 914 (1976)
Mrs. Lucien R. AUSTIN, Jr., et al.
v.
OTIS ELEVATOR COMPANY and Employers-Commercial Union Insurance Company.
No. 6812.
Court of Appeal of Louisiana, Fourth Circuit.
July 29, 1976.
Rehearing Denied September 14, 1976.
*915 Burk & Burk, Maurice Burk, and Herman & Herman, Russ M. Herman, New Orleans, for plaintiffs-appellees.
Drury, Lozes & Curry, James H. Drury and Madison C. Moseley, New Orleans, for defendants-appellants.
Before LEMMON, GULOTTA and BEER, JJ.
LEMMON, Judge.
Otis Elevator Company and its insurer have appealed from a judgment which awarded damages to the widow and children of Lucien Austin, who was injured in an elevator accident. The principal issues on appeal are liability for the accident and the causal relationship between the accident and Austin's death six weeks later.
Otis designed, manufactured and installed the six elevators in the Federal Building in New Orleans, which opened in 1961. In January, 1969 Montgomery Elevator Company took over the maintenance contract for the elevators. Otis nevertheless continued to perform occasional repairs when, because of the size of the job, the General Services Administration (G.S.A., an agency of the Federal Government) was required to award contracts through public bidding.
On September 10,1970 Austin and Wilkin Eden, while on the job with the Veterans Administration, entered elevator # 6 on the fourth floor. Austin pushed the button *916 for the second floor, but the elevator passed the second floor and continued at a rapid rate of speed, finally hitting a buffer pit in the basement and causing injuries to the passengers.
Austin died six weeks later. Plaintiffs then filed this action against Otis and Montgomery, but compromised their claim against the maintenance contractor prior to trial.

LIABILITY
Charles Greene, a mechanical engineering technician for G.S.A., checked the elevator the morning after the accident with a representative from Montgomery. In going over the controller, he noticed that one of the auxiliary contacts in the OFR (one floor run) relay was loose and was making contact even though the switch was open. After examining the wiring diagram, however, Greene determined that the "contact being made up" had no effect on the elevator operation.
The close inspection of the OFR relay did reveal copper blisters on two of the three flexible braided leads, an indication that arcing had occurred. There was also evidence of arcing on the stud of the auxiliary contact.
Greene then simulated the suspected problem by placing a copper jumper between the two leads, and the elevator did not slow down for designated floor stops until the jumper was removed. Greene thus concluded that the arcing of the two leads to the auxiliary contact had caused a short circuiting of the general shunt field resistance, which prevented deceleration.[1] He recommended that all braided leads on all controllers be covered with flexible insulation to prevent contact between leads.
Greene opined that the accident would not have occurred if the leads had been insulated at the time. He could not, however, determine the cause of the arcing, but observed that arcing would not occur under normal conditions between two leads spaced one inch apart or between one lead and the stud, spaced three-fourths of an inch apart; that the looseness of the auxiliary contact would not cause arcing; and that high humidity could have influenced the arcing. No previous arcing had been reported during his seven years of service with G.S.A.
Greene did find some carbon deposits on the panel (the maintenance contractor was responsible for cleaning this weekly) and admitted that a substantial carbon accumulation would lower the resistance between the components and support arcing. However he did not believe the accident was related to Montgomery's failure to perform its maintenance contract properly, and he classified the failure to insulate the OFR relay as a design deficiency.
Charles Michel, Montgomery's employee who accompanied Greene during the inspections and who regularly performed the maintenance work on the elevators, had died prior to trial, but Montgomery's service manager's report based on Michel's information was admitted into evidence. The report stated that after the accident Michel had placed insulation on the leads of the OFR relay in all six elevators and had also found evidence of arcing on two of the other units.
The manager further opined that the looseness of the auxiliary contact would not cause the elevator to run at full speed into the pit, since that contact served "merely to short out a small amount of resistance to make a smoother approach on a one-floor run" and would have affected only the trip between the fourth and third floors. The manager also testified that a similar accident occurred, subsequent to the one in litigation, with the same elevator when an armature broke on a different relay and fell across two leads.
*917 Leiland Walkup, Otis' maintenance supervisor, listed the following possibilities as the cause of the arcing: (1) a metal conductor across the two leads, as perhaps a tool used by somebody working on the equipment[2] or a piece of equipment falling across the leads[3], or (2) an accumulation of dirt or carbon between two or more studs, which would enable an arc to form, or (3) contact between the two leads, as a result of being pushed together.[4] Walkup also stated he was not cognizant before the accident that a short circuit between these leads would cause the elevator to continue into the pit without stopping.
Walkup further testified that the leads on the OFR relay of all elevators manufactured by Otis are uninsulated, but that Otis' service department (at least since he assumed maintenance duties in 1968) has installed insulation on the leads of the OFR relay of every elevator on which Otis had a service contract (at least in this nine-state district). To his knowledge the owners of Otis elevators, which were not under maintenance contract with Otis, were not advised to take this precaution.
After measuring the distances between the two leads and between the leads and the stud of the auxiliary contact, and after determining the temperature and atmospheric pressure on the day of the accident, Walkup determined from reference data that a voltage of over 20,000 volts would have been required to produce an arc. He opined that spontaneous arcing was absolutely impossible over that distance with the 120 volts produced by the generator.
Otis' Liability
The evidence clearly established that the arcing caused the accident. What caused the arcing is a question which is not so clearly answered. It is clear, however, that plaintiff did not prove that any negligence on Otis' part caused the arcing (although there was proof that insulation would have prevented the accident). Otis' liability, if any, must therefore be grounded on its failure to insulate the leads.
Otis' product, which had been designed, manufactured and installed ten years before the accident, did not have insulation on the braided leads of the OFR relay. The evidence demonstrated that if a short circuit occurred between the leads of this relay, the elevator would continue running at full speed into the pit. Nevertheless, Otis protected against this eventuality merely by separating the leads with a non-conductive separator, although all witnesses recognized that this measure would not protect against short circuiting caused by the leads being accidentally pushed together, or by a tool touching two leads, or by an armature falling across two of the leads, or by carbon accumulating because of poor maintenance.
Otis knew or should have known that the elevator would not stop if a short circuit occurred between the leads on the OFR relay. Otis knew or should have known that a mechanic's touching two leads with tools or pushing two leads together accidentally could produce a short circuit which would cause an operating elevator to continue running. Otis knew or should have known that maintenance by human beings is not always perfectly performed and that uninsulated leads offered a fertile supply of accident opportunities to careless maintenance people. As designer and manufacturer of the elevator Otis should have insulated the leads to prevent this foreseeable negligence from producing the foreseeable result or should have warned the owners of its elevators of the necessity of doing so. (One of Otis' maintenance mechanics stated that the company had been insulating the *918 mechanism since he began employment in 1954, before the elevator at issue was installed by Otis.)
We therefore hold that Otis' failure to insulate the leads on the OFR relay rendered the elevator unreasonably dangerous in normal usage, and this absence of insulation constituted a defect or unsafe condition for which Otis is liable as manufacturer to those who are injured as a result thereof.
Montgomery's Liability
In order to recover against Montgomery, it was necessary for plaintiffs to prove (had they not compromised their claim) that Montgomery failed to exercise reasonable care in performing services under its maintenance contract and that Austin was injured as a result of this failure. Otis, in order to prevail in its third party demand for contribution, had to fulfill the same burden of proof. This proof, necessarily depending on circumstantial evidence, is sufficient to constitute a preponderance when the evidence taken as a whole shows that the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
Evidence established that the leads and contacts on the control panel were properly spaced and that voltage in excess of 20,000 volts was required under normal conditions to produce an arc in the area where this arc occurred. Since the generator furnished only 120 volts, arcing would not occur in the absence of abnormal conditions. The only conditions suggested as possibilities by the experts all involved human intervention, and the only persons who had regular access to the control panel were Montgomery's employees.[5]
The circumstantial evidence points heavily to an inference of negligence by Montgomery's employees. While the precise cause of the short circuiting has not been shown, the only plausible explanations advanced indicate that it was the negligence of this defendant rather than the negligence of others which caused the mishap. It is immaterial that the circumstances suggest several causes, since all inferences raised by the circumstances point to the negligence of the particular defendant.
We hold that Montgomery's negligence was a concurrent cause of the accident, which would entitle Otis to judgment on its third party demand for contribution. Inasmuch as plaintiffs' compromise with Montgomery deprived Otis of this right, the award of damages must be reduced by one-half. Harvey v. Travelers Ins. Co., 163 So.2d 915 (La.App.3rd Cir. 1964).

QUANTUM
In the September 10, 1970 accident Austin braced himself on the handrail, but was thrown to his knees when the elevator struck the pit. He immediately experienced pain in the lumbosacral area.
A physician performed a complete physical examination and found tenderness in the lumbosacral area (but no other objective symptoms of back sprain), elevated diastolic blood pressure at 150/100, and mild tachycardia (accelerated heart beat). The doctor diagnosed a mild lumbosacral sprain and anxiety reaction, prescribed muscle relaxants and heat, and instructed Austin to resume work on Monday (after the Thursday accident) and to return to the clinic if problems developed.
X-rays taken at that visit and reported later indicated no fracture of dislocation, but did disclose the calcified edge of a massive abdominal aortic aneurysm, eight to nine centimeters in length. Unanimous medical opinion established that the aneurysm predated the accident (although never causing any previous symptoms) and was *919 caused by Austin's long standing arteriosclerotic cardiovascular disease.[6]
On September 21 Austin returned to the clinic, complaining that he could not straighten up after getting out of an automobile the previous day. The doctor found a positive straight leg raising test but no other objective signs of back injury. Unaware of the aneurysm, he diagnosed lumbosacral sprain and referred Austin to the orthopedic clinic.[7]
The September 30 orthopedic examination did not reveal any objective signs of back injury. Since lumbosacral pain may be caused by a symptomatic abdominal aortic aneurysm, the examining specialist related Austin's complaints to the aneurysm and referred him to the surgical clinic.
On October 1 the examining surgeon found an enlarged aorta, but no tenderness of the abdomen. He advised Austin as to the seriousness of the massive aneurysm recommended surgical intervention. This doctor noted his opinion that the accident did not aggravate the pre-existing aneurysm because the abdomen was not tender and the back pain appeared to be musculoskeletal in origin and related to motion.[8]
The following day Austin was admitted to the hospital on an emergency basis for surgery, but the admitting doctor noted that his diabetes was completely out of control and his blood pressure was still 158/98. On October 7 the surgery scheduled for the next day was cancelled, because the blood pressure was 200/100 and the diabetes was not controlled. The consulting physician increased the dosage of raudixin to control the blood pressure and began Austin on insulin, which he had never previously required. By October 13 Austin's blood pressure was within the range of 140-160/80-90. On October 16 the doctors found Austin fit to undergo an aortagram, but the test was unsuccessful. On October 20 an aortagram was performed without difficulty, and the doctors considered Austin "in optimum condition for his surgery", which was performed on October 23. The operating physician reported that the aneursym "balooned out massively to about softball size" and that he removed massive amounts of necrotic clots. The following day Austin developed back pain and loss of leg motion and sensation (diagnosed as an infarct of the spinal cord), then developed cardiac arrhythymia, and eventually died in cardiac arrest.
Causation
Four physicians reviewed the medical records and reports and testified as to the relationship between the elevator accident and Austin's death. There was fairly general agreement that the aneurysm sustained some trauma in the accident, because of the mechanism of the occurrence. However, the doctors disagreed as to the probable extent and consequences of the trauma. Concededly, no rupture or leakage occurred.
Dr. Charles Menendez, a vascular surgeon, opined that some trauma to the aneurysm was unquestionably produced by the accident and that trauma to an aneurysm can produce pain without causing leakage. He further observed that pain can be *920 caused by expansion of an aneurysm, although some people who have large aneurysms do not have pain.
Dr. Dennis Rosenberg, a cardiovascular surgeon, opined that an aneurysm causes pain only if it expands because of hemorrhage or erodes into the surrounding structures and that the unruptured aneurysm was not the cause of Austin's back pain. While the doctor admitted trauma can cause diabetes to go out of control, he believed that factor did not contribute to Austin's death, since the diabetes was under control at time of surgery. He further admitted that raudixin (given to control Austin's blood pressure) is a dangerous drug which can cause arrhythmia and drop in blood pressure in surgical patients.
Dr. Ted Bloch, an internist, opined that the absence of acute symptomatology of the abdomen, with only the presence of back paid reasonably attributable to sprain, indicated the aneurysm was not aggravated by the accident. He admitted, however, that there is a greater surgical risk when the aneurysm is symptomatic.
Dr. Alvin Cotlar, a vascular surgeon, opined that the back pain was caused by the traumatized aneurysm rather than a back injury, because there were no objective orthopedic findings and the pain continued for several weeks after the accident. He particularly noted that the normal course of an aneurysm is to have a sudden beginning of expansion upon blunt trauma. He further observed that the previously controlled diabetes became suddenly uncontrollable for no other apparent reason (changes in an aneurysm can produce that effect); that trauma to an aneurysm can cause emboli to move into the renal arteries and cause pain (he opined that, if the proper procedure was used in applying the tourniquet around the aorta distal to the renal arteries prior to surgery, trauma did cause the emboli that resulted in thrombosis); that when the aneurysm became symptomatic, the need for surgery became urgent; and that the problems with diabetes and hypertension necessitated the extensive use of drugs to bring these conditions under control, greatly increasing the mortality risk of surgery, since patients are normally taken off these particular medications several days before surgery. Dr. Cotlar concluded that Austin would have had a substantially greater chance of survival had he not sustained the trauma in the elevator accident.
The trial judge, observing that the more persuasive medical testimony concerning trauma to the aneurysm favored plaintiffs, found that the accident caused the aneurysm to enlarge and necessitated urgent surgery. He further found that the accident caused the previously controlled diabetes and hypertension to go out of control, which along with the drugs required to bring these conditions under control, substantially increased the risk of surgery and contributed to Austin's death.
We find the record adequately supports these findings, although there is a wealth of impressive medical testimony that would support a contrary conclusion.
The mechanism of the accident almost certainly caused the aneurysm of that size in that location to sustain some trauma. Competent medical opinion established that trauma can cause an abdominal aortic aneurysm to expand without rupturing, to release emboli into the renal arteries, and to produce back pain without abdominal pain. We conclude the record thus established that the previously asymptomatic aneurysm became symptomatic at the time of the accident, and all experts agree that surgery for a symptomatic aneurysm involves a higher risk.
Furthermore, changes in an aneurysm not only make surgery more urgent, but also can cause diabetes to go out of control. Enlargement of the kidney can also cause an increase in blood pressure.[9] The dilemma thus created in the face of an imminent rupture forced the doctors to administer otherwise ill-advised drugs in order to bring *921 the previously controlled diabetes and hypertension back under control, and instead of discontinuing the dangerous drugs well in advance of surgery, it was necessary for the doctors to increase dosage.
Admittedly, surgical rescission of the aneurysm would have been necessary regardless of the accident, and Austin's diabetes (borderline), hypertension (controlled) and long-standing arteriosclerosis made him a poorer surgical risk than a normally healthy person. Nevertheless, the accident caused the risk to become substantially higher, and the urgency of the situation created by the trauma prevented use of precautionary measures which normally would have been taken to reduce these risks. We conclude in effect that, except for the accident, Austin would have had a substantial chance of survival, but the accident rendered his chances relatively insubstantial. Accordingly, we hold his failure to survive the surgical procedure was causally related to the effects of the accident.
Amount of Damages
Austin was 54 years old at the time of his death and had a life expectancy of over 17 years. Using Austin's 1970 earnings of $12,700.00, an expert economist calculated that Austin would have earned $52,000.00 between the date of death and of trial, at which time he still would have had a work life expectancy of 8.2 years. The expert additionally used several discounting methods, assuming various factors, and calculated that a conservatively invested sum of $82,000.00 to $100,000.00 would be required at time of trial to yield $12,700.00 per year over a period of 8.2 years, at which time the fund would be exhausted. This calculation did not consider income taxes, pension benefits, or a suggested 30% consumption factor, representing the amount the decedent would have spent on himself.
Austin was survived by his widow and three children. Two children were then married (one living in South America), and the third was in college. There was considerable evidence that Austin had been an exemplary husband and father and that the family maintained a very close relationship.
The trial judge awarded $100,000.00 to the widow, $12,500.00 to each of the local children, and $7,500.00 to the other child, in addition to medical expenses. Each side seeks a modification of the award.
All of the awards are adequately supported by the evidence. The most substantial attack is on the insufficiency of the award to Mrs. Austin, which counsel contends barely compensates her for loss of support, without regard to loss of love and affection or to her share of a separate award for Austin's conscious suffering prior to his death.
While a higher award could have been supported by the evidence on these elements of damages, we cannot say that the trial judge did not consider each element in setting the lump sum award or that the amount awarded constitutes an abuse of the much discretion accorded by C.C. art. 1934(3).
The judgment, however, must be reduced by one-half on account of the compromise with Montgomery, discussed above.
Accordingly, the judgment of the trial court is amended to reduce each award by one-half. As amended, the judgment is affirmed.
AMENDED AND AFFIRMED.
BEER, Judge (concurring)
I concur in the result.
However, I find it difficult to conclude that Otis should have insulated the leads when the elevator in question was manufactured and installed some ten years prior to the accident. In my view, Otis' joint accountability stems from their failure to take any steps to notify their former customer of their subsequent-to-manufacture realization of a need for (and the relative nominal cost of) providing insulators for the leads.
Otis, on its own volition, provided such installation of insulation in those instances *922 where the company maintained a service contract with its former sales customer. But, in those instances where the sales customer had not maintained a service contract with Otis, the benefit of being informed of Otis' realization of the need for lead insulation realization gleaned from a combination of experience, research and the acquiring of expanded technical knowledge apparently gained subsequent to the installation of the elevator involved in this litigation was withheld.
I am of the view that an elevator falls into that category of instrumentality which, by the clear and present nature of its use, can require something more of the manufacturer than the sale and subsequent proper installation of the product.
If, through experience or expansion of knowledge or a combination thereof, the manufacturer of such an instrumentality should acquire technical or engineering or other related data which signals a need for, and, thereafter, provokes a change in, its manufacturing procedure and, likewise, provokes it to unilaterally augment such a change in existing items of manufacture which it continues to service, and yet that manufacturer does not at least attempt to advise such sales customers no longer having a contractual relationship with it through any sort of servicing agreement that such change is strongly recommended, then such oversight, when proximately related to an injury, constitutes conduct which I would describe as failure to perform a duty owed under the circumstances.
NOTES
[1] In his reports Green indicated that the combination of the described arcing and the looseness of the auxiliary contact caused the short circuiting. In his testimony, however, he insisted that the loose contact was insignificant except to draw his attention to the evidence of arcing.
[2] In this respect we note that Montgomery's maintenance man was in the building when the accident occurred.
[3] This was determined to be the cause of the subsequent accident in the same elevator.
[4] Walkup admitted that he had once caused a short circuit by accidentally touching two leads together.
[5] The control panels were in enclosed cabinets, but the doors were seldom on the cabinets. However, only a few other people had access to the area and went there only on infrequent occasions.
[6] Prior to the accident Austin had borderline diabetes and suffered from hypertension (also caused by arteriosclerosis), but both conditions had been controlled by medication. He had also suffered an angina attack in 1957. However, Austin led an extremely active life with almost daily participation in church, fraternal and family activities.
[7] At trial this physician admitted in retrospect that the aneurysm was as likely a cause of lumbosacral pain as was a back injury. He also stated that the positive straight leg raising test could be attributed to the aneurysm and that elevated diastolic pressure is an indication of dilation of the aneurysm.
[8] At trial this doctor testified that he would have recommended surgery for any person displaying this large aneurysm, whether or not there had been a traumatic incident. He expressed his opinion that an aneurysm does not cause pain until it leaks, but admitted that diastolic pressure increases as an aneurysm expands.
[9] The autopsy protocol showed Austin had old and recent infarcts of the kidney, and hospital records showed he had high blood pressure the night before surgery.