398 So.2d 590 (1980)
Howard Leo SIBLEY, Jr. et al.
v.
Randy MENARD et al.
No. 13808.
Court of Appeal of Louisiana, First Circuit.
December 15, 1980.
Writ Denied May 1, 1981.
*592 William J. Staser, Baton Rouge and Haydn S. Berey, Livingston, for plaintiff.
Gerald L. Walter, Jr., Baton Rouge, for Southwestern Ins.
John Bivins, Lafayette, for appellants.
James B. Doyle, Baton Rouge, for Lafayette Concrete.
John W. King and Wm. T. Doran, Baton Rouge, for Dept. of Transp. and Development.
Before COVINGTON, CHIASSON and LEAR, JJ.
COVINGTON, Judge.
Plaintiffs-appellees, Howard Leo Sibley, Jr., Ronald Edward Sibley, Helen M. Sibley, individually and as Natural Tutrix of the minor children, Brenda Sibley, Linda Sibley, Charles Sibley and Stephenie Sibley, filed suit against Randy L. Menard, the operator of a 1976 Ford tractor, Will's Trucking, Inc., Menard's employer, and its insurer, Southwestern Insurance Company,[1] for damages resulting from the death of their father and husband, Howard Leo Sibley, Sr., allegedly caused by the negligent operation of the truck by Randy Menard. Subsequently, the original defendants filed a third party demand against the State of Louisiana, through the Department of Transportation and Development, alleging solidary liability, asking for contribution in the event the original defendants were liable to the original plaintiffs, based on the Department's alleged failure to maintain the highway in a safe condition, particularly in allowing the roadway to be substantially elevated above the level of the shoulder. Thereafter, the original plaintiffs amended their petition to name the State, through the Department, as a party defendant, alleging the failure to properly maintain the highway, or warn of the dangerous condition of the highway. The Department answered and also named the original defendants as third party defendants as to the Department.
After trial on the matter, judgment was rendered in favor of the widow, individually, and as natural tutrix of her minor children, in the amount of $586,048.83, representing $100,000 to her for loss of love and affection, $50,000 for each minor for loss of love and affection, $4,277.83 for funeral expenses, and $277,511 for loss of support to the widow and children allocated as follows: Helen Sibley, 58%; Howard Leo Sibley, Jr., 0%; Ronald Edward Sibley, 3%; Brenda Lee Sibley, 5%; Linda Elizabeth Sibley, 8%; Charles Ray Sibley, 10%; and Stephenie Joan Sibley, 16%. The judgment further awarded Howard Leo Sibley, Jr., the sum of $25,000 and Ronald Edward the sum of $50,000 for loss of love and affection. Also, the widow was awarded, in both capacities, $3,000 as attorney's fees and $1,260 as 12% penalty against Southwestern Insurance Company. In addition, certain expert witness fees were taxed as costs. The judgment provided that the liability of the defendants, Randy L. Menard, Will's Trucking Company, Inc. and the State was solidary. It further provided judgment against Southwestern Insurance Company in the amount of its policy limits as liability insurer of Menard and also against Southwestern as the uninsured motorist carrier of Howard L. Sibley in the amount of $200,000. All of the defendants cast in judgment then appealed.
Subsequent to the judgment and pending appeal, Southwestern settled with the plaintiffs and dismissed its appeal. The settlement provided that the insurer pay to the plaintiffs the sum of $100,000, plus interest, and subrogated the insurer to the sum of $75,000 against the other defendants. The plaintiffs reserved their rights against said other defendants.
The accident occurred on November 1, 1976, between an empty gravel truck operated *593 by Randy L. Menard and a loaded gravel truck operated by Howard Leo Sibley, Sr. on Louisiana Highway 16 in the Parish of Livingston. Immediately prior to the accident, the Sibley truck was proceeding in a southerly direction on Highway 16, a bituminous-surfaced two-lane roadway, away from the gravel pit, while the Menard truck was traveling in a northerly direction on the same highway, headed toward the gravel pit. As Menard entered the curve where the accident occurred, his vehicle went out of control; and as he attempted to regain control, his truck swerved across the centerline into Sibley's lane of traffic and struck the Sibley vehicle with such impact as to cause Sibley's death.
In the trial, the judge found that Menard was negligent in the operation of his vehicle in operating his truck at an excessive rate of speed and failing to maintain control of the same. From the testimony of Randy L. Menard, the driver, and David Dumesnil, his passenger, the trial judge found that Menard "was traveling at a rate of speed which prevented the safe negotiation of the curve in question" and his negligent operation was "a cause in fact of the accident sued on herein." We agree.
The law is clear regarding the responsibility of a motorist under circumstances similar to the instant case. LSA-R.S. 32:64A requires that a motorist not drive at a speed faster than that which is reasonable and prudent, consistent with the width and surface of the roadway and other conditions, such as the weather. Kentzel Truck Lines, Inc. v. State Farm Insurance Co., 342 So.2d 1133 (La.App. 1 Cir. 1977); Mack v. Employers Commercial Union Insurance Company of America, 269 So.2d 470 (La.App. 1 Cir. 1972).
From Randy Menard's own testimony, we learn that he was nervous due to the narrowness of the roadway, the curving of the roadway, and the other sand and gravel trucks which he was constantly meeting. His brother's warnings of the dangerousness of Highway 16, and his operating a truck on this perilous roadway against the express admonitions of his brother, did not add to his sense of well being. Menard was obviously an inexperienced truck driver; he had actually driven an 18-wheeler only a few times; he had gone to no school for this type of training; he had received only casual instructions in driving large trucks from his brother and another truck driver; he did not have a chauffeur's license, and this was the first time he had driven this particular truck.
All of the credible evidence points toward the fact that Menard tried to negotiate this dangerous curve at a rate of speed in excess of 35 M.P.H., which was faster than a reasonable speed at which the curve could be negotiated. Trooper Robert Createur, who investigated the accident, was of the opinion that Menard left the roadway at a "high rate of speed." There can be no question that Randy L. Menard was negligent in the operation of his vehicle. Will's Trucking, Inc., as his employer, is thus liable.
On appeal, Menard relies upon Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979). Rue involved a one-car collision. The motorist inadvertently slipped off the roadway onto a dangerously rutted shoulder, which caused the driver to lose control of the car. The question for the State Supreme Court was whether the motorist's "substandard" conduct in leaving the paved surface of the highway barred recovery of the plaintiff's damages. The Court held that it did not. The Rue Court did not go so far as to suggest that the Department's negligence in maintaining its highways absolves a negligent motorist of "fault" toward an innocent third party. Rue merely cleanses the hands of the motorist whose conduct is below standard, in his relationship with the State, through its Department of Transportation and Development (Highways), so that he may recover for damages due to the fault of the State; it does not provide such a motorist with a shield against the claims of an innocent victim.
The primary contention of the Department is that the plaintiffs failed to prove negligence on its part. The Department's position is that the plaintiffs failed to prove *594 that there existed any condition of the roadway at the time of the accident which was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver; and also, that if such an unsafe condition actually existed, the plaintiffs failed to prove that the Department had either actual or constructive knowledge thereof.
In the recent case of Brown v. Louisiana Department of Highways, 373 So.2d 605, 606 (La.App. 3 Cir. 1979), writ denied, 376 So.2d 1269 (La.1979), the Court set forth the responsibilities of the Department in the following language:
"The legal responsibility of the Department as to highway accidents was generally stated by this court in LaBorde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3 Cir. 1974), writ denied, 303 So.2d 182 (La.1974) as follows:
"`The Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. The department is liable for damages only when it is shown (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it.'
"Also see U.S.F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976) and Guin v. State Through Dept. of Highways, 360 So.2d 1185 (La.App. 3 Cir. 1978).[2]
"Included within the Department's duties is the maintenance of the shoulders of the highway in a reasonably safe condition. Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979)."
With respect to the negligence of the Department, the Court below found that:
"[T]he shoulder was not adequately maintained, and the roadway was less than the recommended width at the time of the accident. The roadway, as originally constructed some years ago apparently met applicable standards at that time. However, maintenance and repair of the shoulder combined with the narrow width or (sic) the road is a proximate cause of this accident. The knowledge of the Department that the roadway did not meet current standards imposed upon it a duty to treat the shoulders in a manner so as to minimize the effect of the narrowness of the road. This was particularly true since the Department had actual knowledge of the types of vehicles, gravel trucks, which frequently used the road. Therefore, the width of the road combined with the low quality of maintenance constitutes negligence on the Department."
There was substantial testimony as to whether a dangerous condition did exist at the site of the accident and whether the Department had actual or constructive notice of such a defect.
Duaine T. Evans, a consulting traffic engineer who was recognized by the trial judge as an expert in traffic control and traffic engineering, testified that the elevation difference between the roadway and the shoulder in this case constituted a hazardous condition which tended to cause a motorist to lose control of his vehicle when a wheel ran onto the shoulder. He also indicated that the warning sign was placed too close to the curve and designated a speed at which it was actually unsafe to negotiate the curve. The expert also noted the narrowness of the roadway, ten feet width for each of the two lanes, and the extreme narrowness and rutted condition of the shoulder. In his testimony he expressed the following opinion:
*595 "Q. And would you describe the conditions of that shoulder, with regard to the bituminous mixture?
A. Well, the bituminous mixture has been placed in a depressed area or a worn out area, adjacent to the roadway itself. It has numerous holes and obvious low spots in it, to the actual surface of that bituminous area, and it's bumpy. The patching is bumpy. It's below the surface of the roadway.
Q. Could you determine how far below the edge of the roadway that's located?
A. I would say two to four inches lower than the roadway.
Q. Now, Mr. Evans, in connection with your work as a traffic engineer, could you describe what the effects of driving in a northerly direction at thewell, let's put it this way, driving in a northerly direction at somewhere in the neighborhood of the speed recommended by the Department of Transportation as per their sign on the curve showing thirty-five miles per hour?
A. Well, traveling north on this roadway approaching this curve the driver is warned of the curve later than he should be because the curve is placed closer to the curve than it shouldthe sign is placed closer to the curve than it should be. The advisory speed of thirty-five, in my opinion, based on my studies, is five miles per hour higher than it should be, si (sic) if a driver were to approach this curve he wouldwhen he saw the thirty-five, he would tend to slow up, however, his reduction in speed would be later than it should be, so he would not necessarily reach the thirty-five, or reduce to thirty-five as soon as he should. He would be going a little faster than he should be through the curve, even if he managed to get down to thirty-five he would be going a little faster than he should be. He would have a tendency, because of the nature of the curve itself, it's a left hand curve northbound, he would have a tendency for his right wheels to get off the edge of the pavement, or to get over to the edge and maybe off, depending upon the size of his vehicle. A vehicle such as involved in this accident used up most of the lane of travel in its normal usage so he didn't have a lot of space to play with, and his wheels would tend to get off sooner than an automobile would. In attempting to negotiate the curve, the normal reaction of getting two wheels off the edge of the pavement, the normal reaction is to steer back onto the roadway. And in order to recover your vehicle back onto the roadway you have to actually oversteer. In so doing, there is that possibility that you will oversteer too much and because of the condition and the elevation of the shoulder this was a good possibility, because you have to oversteer to overcome that drop-off. And in oversteering there's a possibility you will get into the wrong lane of traffic.
Q. As I appreciate it the momentum of the vehicle would be towards the outside of the curve in this particular instance?
A. That's correct. At that speed the momentum would force the vehicle toward the outside of the curve off onto the edge of the shoulderoff onto the shoulder, that is, off the edge of the pavement onto the shoulder."
M. K. Johnston, a district maintenance engineer for the Department, conceded that this curve did not meet Department standards: the shoulder was very narrow, "not but about maybe eighteen inches, two foot shoulder at the widest points." With the narrowness of the roadway, the abrupt drop-off and the rutted condition of the shoulder, he considered it to be a dangerous *596 situation. Trooper Robert Createur observed the rut in the shoulder and estimated it to be "some three to four inches in depth." Charles Cantu and Ben Fugler, both of whom lived in the vicinity of the accident, testified to the sharp drop-off. The drop-off from pavement to shoulder was so abrupt that Fugler was not able to get his sports car in and out of his driveway without the underside dragging. The numerous photographs taken at the scene of the accident vividly portray the patently dangerous condition of the roadway and shoulder, particularly the drop-off. Cantu testified to some five or six vehicular accidents in this particular area prior to the one in question, most of which ended up in his front yard.
We next consider whether the Department had actual or constructive notice of such condition. The road was heavily traveled, particularly by sand and gravel trucks. At this curve the wheels of these and other trucks were continually dropping off the pavement, keeping the shoulder in a bumpy, rutted condition. The state trooper commented upon the bad condition of the roadways and shoulders in this area. The Department employees testified that they were aware of the elevation of the roadway over the shoulder, causing abrupt drop-offs. There had been little or no maintenance in this area since the overlay in 1974. Cantu has reported some of the accidents to the police and has complained of the condition of the roadway to parish officials. Fugler testified that he had specifically complained of the roadway conditions to Romie A. McMorris, the Department's maintenance superintendent who was in charge of maintaining this particular roadway. The trial court found:
"Suffice to say that in this Court's opinion, based upon this entire testimony and especially the testimony of the two disinterested witnesses, that the Department had more than notice of the defects, it had specific knowledge and was negligent in failing to take any steps to protect the public."
The evidence reveals that the dangerous condition of this particular curve, with the inadequate and hazardous shoulder, was actually known to the Department. Many vehicular accidents had occurred at this location over a long period of time and local residents had complained to the Department about the hazardous condition. See Gayle v. Department of Highways, 205 So.2d 775 (La.App. 1 Cir. 1967), writ refused, 251 La. 932, 207 So.2d 538 (1968).
This summary of evidence clearly reflects that the dangerous condition, a hazardous drop-off from the pavement to the shoulder, rutted and bumpy shoulder and improper warning sign designating this sharp curve, existed at the time of the accident in question, which condition was obviously dangerous to a person exercising ordinary care and reasonable prudence. The record also shows that although the Department had prior knowledge that the dangerous condition existed for a long period of time before the accident, it failed to remedy the defect and took no steps to install proper warning devices. Thus, the record supports the trial court's holding that the Department was negligent in allowing such an unsafe condition to exist and that the dangerous condition was a proximate cause of the accident.
Considering the evidence discussed above, the trial judge concluded that the negligence of Randy L. Menard in the operation of his gravel truck and the negligence of the State of Louisiana, Department of Transportation and Development, concurred in causing the accident which resulted in Mr. Sibley's death. We agree. Brown v. Louisiana Department of Highways, supra; Robertson v. Handy, 354 So.2d 626 (La.App. 1 Cir. 1977), writ denied, 356 So.2d 434 (La.1978).
The department's next contention on appeal is that the trial court erred in excluding the testimony of an expert witness who was not listed in the pretrial order.
Article 1551 of the Code of Civil Procedure states as follows:

*597 "In any civil action in a district court the court may in its discretion direct the attorneys for the parties to appear before it for a conference to consider:
(1) The simplification of the issues;
(2) The necessity or desirability of amendments to the pleadings;
(3) What material facts and issues exist without substantial controversy, and what material facts and issues are actually and in good faith controverted;
(4) The possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof;
(5) The limitation of the number of expert witnesses; or
(6) Such other matters as may aid in the disposition of the action.
"The court shall render an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel. Such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."
The trial court had issued a pretrial order in this case, narrowing the issues and listing the witnesses. That order controls the subsequent course of action unless modified at the trial to prevent manifest injustice. The judge refused to modify his order to permit the expert witness to testify. Much discretion is left to the trial judge in this matter. As was stated in Brown v. Hawkins, 244 So.2d 896, 899 (La. App. 1 Cir. 1971), writ refused, 258 La. 572, 247 So.2d 393 (1971):
"* * * An orderly disposition of each case and of the entire docket and the avoidance of surprise are inherent in the theory of pre-trial procedure and are sufficient reasons for allowing the trial judge to require adherence to the pre-trial order in the conduct of an action."
See Avondale Shipyards, Inc. v. Larose Shipyard, Inc., 289 So.2d 192 (La.App. 1 Cir. 1973).
The record shows that a list of witnesses were submitted to the trial court at the pretrial conference and that the Department did not specifically list this particular expert on their list of witnesses, or list any expert as a witness. At the April pretrial conference, trial was set for two days early in the month of October. It was begun on October 8, and continued through October 9, 1979, at which time the plaintiffs rested their case. Between the April and October dates the Department made no attempt to add to or change the list of witnesses, or modify the order in any way. Due to the court's schedule, at the close of plaintiffs' case it was necessary to recess the matter until October 24, 1979. During the 15 day recess, the Department filed no motion or letter in the record indicating that the expert would be called, and no attempt was made to amend the pretrial order, despite the fact that the Department had contacted the expert on October 10, 1979, the day after the plaintiffs had closed their case. The expert was called by the Department as its last witness. The trial judge sustained the objection to his testimony, remarking:
"The Court feels that it would be a miscarriage of justice and a breach of discretion to permit this witness to testify when the other parties to this litigation had no knowledge of his pending testimony and thus, would be deprived of adequate cross-examination. The plaintiff specifically would be deprived of the opportunity of rebuttal evidence with other experts, specifically their own expert of Mr. Evans, who has been discharged and is not even present to hear the testimony of the Department of Transportation and Development."
Since the parties had limited the issues and the witnesses with the pretrial conference and the pretrial order, and the order was not subsequently modified despite ample opportunity for the parties to seek modification thereof, the trial judge did not abuse his discretion in excluding the testimony of this "eleventh-hour expert."
*598 The appellants next complain of the alleged excessiveness of the award to the plaintiffs, specifically complaining of the way in which one item of damages, loss of support, was figured.
In the assessment of quantum of damages, much discretion is left to the trier of fact. Such award may be disturbed on appeal only if the record clearly reveals an abuse of this much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976). We do not find any abuse of discretion in the amounts awarded to the wife and children of Howard Leo Sibley, Sr.
In the case of Blanchard v. Rodrique, 340 So.2d 1001, 1005 (La.App. 1 Cir. 1976), writs denied, 341 So.2d 1129, 1130 (La.1977), this Court said:
"The settled jurisprudence of this state is that damages for loss of support are speculative in nature and cannot be calculated with mathematical certainty. The most a Court can do in such cases is to exercise sound judicial discretion and award an amount which, considering all of the circumstances, seems just to both parties and is not unduly oppressive to either. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968); McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961).
"Factors which should be weighed in determining the amount due for loss of support include the decedent's present earnings, his age and life expectancy, his work life expectancy, the possibility of a decrease or increase in his earnings, the decedent's job security, the nature of decedent's work, his health, his relationship with his family, his personal expenses and his past work record. Other factors are the surviving spouse's age and health, the minor children's age, and the effects of inflation and the need to discount future earnings to a present day amount. In short, all factors relevant to a determination of the amount of the loss of support due to the premature demise of the decedent should be considered."
The record in this case, when considered in light of the trial judge's award for loss of support and his explained reasons therefor, clearly shows that he considered those relevant factors, as set out in the Blanchard case, necessary to determine the amount of loss of support. He fixed that sum at $277,511.00, allocated as follows: Mrs. Sibley, 58%; Howard L. Sibley, Jr., 0%; Ronald E. Sibley, 3%; Brenda Lee Sibley, 5%; Linda E. Sibley, 8%; Charles R. Sibley, 10%; and Stephenie J. Sibley, 16%.
The record shows that the trial judge considered the testimony of Dr. George Randolph Rice, a professor of economics at L.S.U., in arriving at the amount to be awarded for this element of damages.
It is, of course, elementary that expert economic testimony is only a guide to courts in fixing awards for loss of support. It is also basic that trial judges have a wide range of discretion in fixing damages and that their awards should not be disturbed on appeal in the absence of abuse of their much discretion. Reck v. Stevens, supra.
Considering the foregoing, we find that, whatever approach was used in fixing the award for loss of support of which appellants complain, or whatever deductions the trial judge considered should not be made from the mathematically imprecise figure fairly reached by him, the award finally arrived at under the circumstances of this case is within the bounds of the discretion accorded the trial judge. Barr v. State, Through Louisiana Department of Highways, 355 So.2d 52 (La.App. 2 Cir. 1978), writs denied, 355 So.2d 1324 (La.1978); Aymond v. State, Department of Highways, 333 So.2d 383 (La.App. 3 Cir. 1976), writ denied, 337 So.2d 875 (La.1976).
The Department also contends that the award against it should be reduced inasmuch as plaintiffs' compromise with the co-defendant, Southwestern Insurance Company, deprived the Department of its right to contribution from the co-defendant.
When a plaintiff releases one of two joint tortfeasors, the unreleased joint tortfeasor is effectively deprived of the right of contribution. *599 Recognizing this, the Court in Harvey v. Travelers Insurance Company, 163 So.2d 916 (La.App. 3 Cir. 1964), decreed that the plaintiff in such a situation is only entitled to recover one-half of his damages from the unreleased tortfeasor. See also Austin v. Otis Elevator Company, 336 So.2d 914 (La.App. 4 Cir. 1976); Cunningham v. Hardware Mutual Casualty Company, 228 So.2d 700 (La.App. 1 Cir. 1969).
For the reasons assigned, the judgment appealed is amended to reduce each award by one-half.
As thus amended, and in all other respects, the judgment is affirmed; costs of this appeal in the amount of $3,259.37 is to be paid by the defendant-appellant, State.
AMENDED AND AFFIRMED.
NOTES
[1] Other parties were joined as defendants in the original or supplemental pleadings but are no longer in the case.
[2] Also see Sinitiere v. Lavergne, consolidated with Lavergne v. State of Louisiana, Through the Department of Transportation and Development, 391 So.2d 821 (La. 1980), decided by our Supreme Court on November 10, 1980.