325 So.2d 318 (1975)
Ellarine THIBODEAUX, etc., Plaintiff-Appellant,
v.
FIREMAN'S FUND INSURANCE COMPANY et al., Defendants-Appellees.
No. 5254.
Court of Appeal of Louisiana, Third Circuit.
December 24, 1975.
Rehearings Denied January 28, 1976.
*319 Daniel J. McGee and A. Bruce Rozas, Mamou, for plaintiff-appellant.
Lewis & Lewis by John M. Shaw, Opelousas, for defendants-appellees.
Before HOOD, CULPEPPER, MILLER, WATSON and CUTRER, JJ.
WATSON, Judge.
Plaintiff, Ellarine Thibodeaux, individually, and as natural tutrix of her minor child, Julius James Bergeron, filed this suit to recover damages for injuries the child received when his bicycle was struck by an automobile driven by defendant, Leslie L. Derouen. Other defendants are the owner of the automobile, F. J. Derouen, Jr., and its insurer, Fireman's Fund Insurance *320 Company. The trial court dismissed plaintiff's suit, finding that Leslie Derouen was not negligent and Julius was guilty of contributory negligence.
Plaintiff has appealed, contending that the trial court erred in:
(1) failing to find Leslie Derouen negligent even though she was admittedly exceeding the speed limit;
(2) holding the eight-year-old bicycle rider contributorily negligent;
(3) failing to apply the doctrine of last clear chance;
(4) failing to hold that Leslie Derouen's failure to call her passenger as a witness creates a presumption that the witness's testimony would have been unfavorable.
The questions presented are:
A. whether there is manifest error in the trial court's holding that there was no negligence on the part of the defendant driver;
B. whether there is manifest error in the holding that the bicyclist was guilty of contributory negligence; whether the trial court erred in not applying the presumption of adverse testimony as to the driver's passenger in its consideration of contributory negligence; and
C. if liability is present, what damages should be awarded plaintiff
The testimony on the question of liability presents the facts:
Leslie Derouen testified in person and by deposition as follows: The accident occurred on May 15, 1971, in Eunice, Louisiana. She was, at that time, 15 years old and was accompanied by a friend and classmate, Martha Stone. She was driving in an easterly direction on Betty Street, in a residential area with little traffic and a 25-mile per hour speed limit. The weather was clear and dry; the station wagon she was driving was new. When she turned the corner, about a block and a half away from the site of the accident, she saw children playing in the yard at the corner of Fannie and Betty Streets. Leslie was familiar with the neighborhood and had seen young children in the area on previous occasions. As Leslie approached the "T" intersection of Fannie and Betty Streets, she saw a boy on a bike coming fast from Fannie Street into the intersection. Her speed was admittedly over the limit but estimated at not over 35 miles per hour. She put on her brakes and swerved to the right. She could have avoided hitting the boy except for the presence of a parked automobile on the righthand side of the road. Her companion screamed just prior to the impact. Leslie identified photographs of the intersection and the Julius Bergeron home on the corner. She said Julius and the bike fell near the point of impact, perhaps two feet away, after a glancing blow from the car.
Ferdie Labbe, an employee of the Eunice City Police Department for 19 years, testified that he investigated the accident, which occurred around 5:00 p.m. The skidmarks left by the Derouen automobile measured approximately 102 feet. The speed limit was 25 miles per hour; there was a stop sign controlling the traffic entering Betty Street from Fannie Street. There is no center line on Betty Street; it is very narrow. Officer Labbe said the point of impact was approximately in the center of Betty Street.
Julius James Bergeron, age 11 at the time of trial, testified that he was eight years old on the day of the accident and had not been to school that day because of mumps. He was then in the second grade but had repeated the first grade. Julius had been riding his bike in the yard of his home. He cut across the corner of his yard onto Betty Street; saw a car and heard its brakes and horn. He stopped his bike and was hit by the car.
*321 George Joubert, Jr., elementary school principal, testified that he knew Julius, a student at his school who had attended first grade there. Julius' I.Q. was in the average realm.
Joann W. Derouen, mother of Leslie Derouen, testified that she took the photographs in the record of the scene.
Ms. Estelle Perrault, a professor at LSU Eunice, testified that she was familiar with the accident scene. She heard the noise of the accident while inside a nearby house. Betty Street is asphalt with grass and gravel on the shoulders. The bicycle, which was badly damaged in the accident, was located on the northern edge of the asphalt. There was also a small amount of blood at that point. Both Ms. Perrault and Mrs. Derouen testified that, after the accident, there was a scratch on or near the front door of the Derouen automobile. Mrs. Derouen said it was on the driver's side; she did not recall seeing it on her car prior to the accident.
Dr. J. D. Cole, a clinical psychologist, testified that he gave Julius a battery of tests and concluded that Julius had verbal ability in the dull normal range and motor ability in the mid-average range.
A. Negligence of Leslie Derouen
There is no question that Leslie Derouen's conduct was a cause in fact of the harm to Julius. Leslie was under a legal duty to refrain from driving over the speed limit, to drive in her proper lane of traffic and to exercise caution in a residential area where she knew small children were present. She breached the duty of care owed by motorists to others on the streets. Leslie Derouen admitted that she was exceeding the posted speed of 25 miles per hour on a narrow untraveled road in a residential area. The trial court said she was exceeding the posted speed limit and going 30 to 35 miles per hour.
The trial judge erred manifestly in his computation of the station wagon's speed on the basis of the 57 feet of skidmarks leading to the point of impact. He should have calculated the speed on the basis of the 102 feet of clearly visible skidmarks (D-1 and D-2). On the basis of the speed charts reflected by the exhibit P-1, a joint offering which includes figures from "Driver's Guide" Department of Public Safety, Blashfield, and Lawyer's Motor Vehicle Speed Chart 1950, all of which vary to some extent, the 102 feet of skidmarks indicate a speed of 40 to 50 miles per hour. This speed was clearly excessive on a narrow blacktop city street where children were seen playing nearby.
The new station wagon must have accelerated very rapidly from the corner where she turned onto Betty Street to the point of the accident. The quick acceleration and fast speed clearly demonstrate negligence by the driver.
In addition, there are other indications of negligence. Leslie testified that she saw a boy on a bike coming off Fannie Street toward Betty Street and that she swerved to the right to avoid him. However, a photograph in the record as D-2 indicates that her automobile was in fact in the center of Betty Street prior to the accident rather than in the right lane of traffic. This is confirmed by the testimony of Officer Labbe that the impact, even after Leslie swerved, was approximately in the center of the road. Leslie Derouen testified in deposition that she was familiar with the area, and had seen small children in the area before. She also testified that, when the bicycle glanced off the car, the boy and bike only fell a couple of feet. Estelle Perrault was on the scene immediately after the accident and testified that the bicycle was next to the edge of the asphalt on the north side of the street and there was also a small amount of blood there. The evidence all indicates that Leslie Derouen was not only exceeding the speed limit on a narrow street where she had noticed that children were present, but was also, even after she swerved to the *322 right, in the middle or slightly to the north of the middle of the road. She saw the bicycle coming out of Fannie Street into the intersection. There were no obstructions to her vision, according to her own testimony, and her failure to take evasive action and avoid the child constitutes negligence. Comeaux v. Dupuis, 254 So.2d 687 (La.App. 3 Cir. 1971); Ates v. State Farm Mutual Automobile Insurance Co., 191 So. 2d 332 (La.App. 3 Cir. 1966).
B. Contributory Negligence of Julius
An eight-year-old of average intelligence is legally capable of contributory negligence.
However, it must be remembered that contributory negligence is an affirmative defense, and the burden of proof is on defendants. Miss Derouen failed to call her friend, companion and classmate, Martha Stone, to establish this defense. It is presumed that Martha Stone's testimony would have been adverse to Miss Derouen. Marshall v. Southern Farm Bureau Casaulty Co., 204 So.2d 665 (La.App. 3 Cir. 1967), writ refused, 251 La. 860, 206 So.2d 711, U.S. cert. den., 393 U.S. 883, 89 S.Ct. 189, 21 L.Ed.2d 158; New Amsterdam Casualty Company v. Culotta, 230 So.2d 339 (La.App. 4 Cir. 1970). Also see King v. Jarvis, 144 So.2d 616 (La.App. 4 Cir. 1962).
The question arises as to whether the plaintiff should have called Martha Stone. Due to the close association between the two girls and the fact that Martha Stone was a passenger in the vehicle driven by Miss Derouen, we attribute the failure to call this eyewitness to the defendants, rather than plaintiff. The presumption is that her testimony would have been unfavorable to Miss Derouen. The trial court erred as a matter of law in failing to give weight to this presumption.
Aside from the issue of Martha Stone, we find no reasonable factual basis for holding Julius Bergeron contributorily negligent. We find, therefore, manifest error.
Leslie Derouen, who with Julius was the only other witness to the accident, said she had no idea whether the boy saw her or not. Julius testified that he heard the sound of the car's brakes and slammed on his bicycle brakes to stop his progress into the intersection but was struck by the automobile. There is no evidence that Julius knowingly ventured into the path of the automobile. Dupuy v. Pierce, 285 So.2d 321 (La.App. 3 Cir. 1973). The evidence in the record does not establish contributory negligence for a youngster, which is:
". . . gross disregard of one's safety in the fact of known, perceived and understood dangers . . ." Cormier v. Sinegal, 180 So.2d 567 at 570 (La.App. 3 Cir. 1965).
Considering such factors as the 40 to 50 miles per hour speed of the station wagon, the residential neighborhood, the narrow street, the children playing in the area, and the bike being struck by the left side of the station wagon which extended partially (according to the location of the skid marks) onto the wrong side of the street, we do not find reasonable a conclusion that defendants have carried their burden of proving that Julius was negligent in failing to see the vehicle or in venturing into Betty Street.
This case is remarkably similar in many respects to Kelly v. Messina, 318 So.2d 74 (La.App. 4 Cir. 1975), recently decided by our brothers of the Fourth Circuit, which reversed the trial court in a speeding automoble-bicycle case where skid marks of 100 to 100 feet indicated excessive speed of about 49 miles per hour. As we understand the Kelly opinion the child's (11 years old as compared to 8 here) conduct did not amount to contributory negligence under the circumstances. We reach the same conclusion here.
*323 The trial court erred in its conclusion, therefore, that Julius was guilty of contributory negligence.
We do not reach the question of whether Leslie Derouen had the last clear chance to avoid the accident.
C. Damages
It was stipulated that Fireman's Fund Insurance Company carried a policy of public liability insurance on the Derouen automobile sufficient to satisfy any judgment rendered.
The evidence as to damages was as follows:
Julius was first seen at the Savoy Memorial Hospital in Mamou, Louisiana, by Dr. Wayne G. LaHaye, whose report was offered in evidence without objection in lieu of his testimony. His report shows a fracture of the left femur and lacerations of the scalp and right hand. Julius was hospitalized, treated with traction, a spika cast and medication. X-rays were taken. Julius was also treated by Dr. Gary J. LaFleur, whose report was entered in evidence without objection in lieu of his testimony. Dr. LaFleur saw Julius the day after the accident for surgical treatment of the fractured femur. Julius was treated with traction until June 17, 1971, approximately five weeks after the accident, when he was placed in a spika cast. Julius remained in the cast until August 3, 1971, when it was removed and he was started on crutches. On October 22, 1971, Julius was discharged with an adequately healing femur. Dr. LaFleur last saw Julius on May 29, 1974, when this doctor found recovery from the fracture with a residual increase in length of the left leg of 3/8 inches. Dr. LaFleur also found some angulation which was not clinically significant. Heel elevation of the right leg was suggested but no further treatment recommended. Dr. LaFleur found a permanent disability of eight to fifteen per cent.
Dr. George P. Schneider, stipulated as an expert in orthopedic surgery, testified in deposition that he saw Julius James Bergeron on July 16, 1973. Examination showed a mild adduction type swing of the left leg which Dr. Schneider described as a transitory thing during rehabilitation. The left femur was 3/8 of an inch longer than the right. There was moderate residual angulation at the fracture site. Dr. Schneider stated that Julius had a permanent residual disability of 15% of the left leg. Dr. Schneider said Julius' complaints of pain and discomfort were justified on the basis of the physical findings.
Dr. William Preston Cloyd, a psychiatrist in Lafayette, Louisiana, testified in deposition as an expert in psychiatry. Dr. Cloyd saw Julius on referral from Dr. LaFleur on May 15, 1974. Dr. Cloyd said that Julius had emotional difficulties and the accident had been a precipitating factor in the manifestation of these symptoms. Dr. Cloyd scheduled re-examination on May 28. He placed Julius on a mild antianxiety, anti-depressant type medication and made arrangements for him to be counseled by a psychiatry social worker under supervision. Dr. Cloyd's diagnosis was as follows:
". . . a neurosis following trauma which has been manifest by personality changes, anxiety, depressive symptoms. . ." (Tr. 48)
Moses S. Pickney, assistant principal at Eunice Elementary School, testified that he had been in the teaching profession for 17 years and knew Julius from a physical education class which Mr. Pickney taught and in which Julius was enrolled. He had previously known Julius from a fourth grade physical education class. Mr. Pickney said that Julius had complained on a couple of occasions about his leg hurting him. Mr. Pickney said that Julius likes sports, particularly baseball and appears to have no special problems, although of only average ability.
*324 Dr. Ladislas Lazaro, III, stipulated as an expert in orthopedic surgery, testified that he examined Julius on October 9, 1972, at the request of Dr. Rodney Perron. At that time Julius complained of intermittent pain in the thigh area radiating to the left knee related to activity. Dr. Lazaro's examination revealed angulation of the femur, a slight discrepancy in leg length and an unusual gait. X-rays indicated osteoporosis of the left knee because of disuse and angulation of 4 to 6 degrees at the site of the fracture. Dr. Lazaro encouraged normal activity to resolve the osteoporosis of the knee. Dr. Lazaro saw Julius again on January 25, 1973. There was angulation of 10 to 11 degrees where the bone was bowing at the fracture site which Dr. Lazaro thought was acceptable and would not impair function of the leg. The osteoporosis of the knee had cleared up. Dr. Lazaro again saw Julius on December 4, 1973. Julius complained of pain in the left thigh after activity. Dr. Lazaro stated that Julius would have a residual impairment to the left femur throughout his lifetime which might place additional stress on the hip and knee joints. This was evaluated as a 14% disability of the left leg. Scanograms showed an overgrowth of the left femur of 1.5 centimeters, or approximately 5/8 of an inch. Dr. Lazaro stated that this was a significant leg length inequality which created a pelvic obliquity and stress on the lumbosacral area. These problems might cause difficulties later in life. Dr. Lazaro did not think the leg length discrepancy would resolve itself and recommended an elevated shoe on the right foot. Julius' complaints were stated to be not inconsistent with the medical findings.
Julius Bergeron's accident necessitated extensive medical treatment, as detailed above. However, his mother testified that she had not paid the bills for this treatment but had submitted them to the Louisiana Welfare Department. The welfare Department has not intervened, and Mrs. Thibodeaux can not recover these expenses since she has not assumed the obligation of paying them. Collins v. Allstate Insurance Company, 264 So.2d 693 (La. App. 4 Cir. 1972).
An award of general damages for pain and suffering and permanent disability in the amount of fifteen thousand dollars is justified by the evidence. In Johnson v. Fred H. Moran Construction Company, 289 So.2d 323 (La.App. 1 Cir. 1974), writ refused, La., 293 So.2d 171, $15,000 in general damages was awarded for a 20% disability of an ankle and emotional stress and strain. In Adams v. Employers Liability Assurance Corp., 232 So.2d 311 (La. App. 3 Cir. 1969), a minor received $15,000 for a 25% permanent, partial disability of the left leg. In Skains v. Allstate Insurance Company, 264 So.2d 230 (La.App. 1 Cir. 1972), a seven-year-old with a 15 to 20 per cent disability of the left leg and other injuries received $14,000. The leg injury in Skains was strikingly similar to that here in treatment and residual. Although Julius did not have the other injuries of the child in Skains, he has suffered more than the usual mental trauma.
For the foregoing reasons, the judgment of the trial court herein is reversed, and
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Ellarine Thibodeaux, individually, and as natural tutrix of her minor child, Julius James Bergeron, and against defendant, Fireman's Fund Insurance Company, in the amount of fifteen thousand and no/100 dollars ($15,000.00), together with legal interest from date of judicial demand, until paid.
All costs are assessed against defendant-appellee, Fireman's Fund Insurance Company.
Reversed and rendered.
*325 MILLER, J., dissents and assigns written reasons.
HOOD, J., dissents for the reasons assigned by MILLER, J.
MILLER, Judge (dissenting).
I am unable to agree to the reversal of the trial court's factual determinations. In my opinion appellants failed to establish manifest error in the trial court finding of contributory negligence on the part of an 8½ year old child who ran his bicycle at high speed through a stop sign at an obstructed (not blind) intersection. The bicyclist ran into the side of the right-of-way vehicle after the motorist had applied brakes immediately after seeing the bicyclist come into view.
In carefully considered written reasons the trial court found the child to be "an average child" who "was familiar with the intersection, was familiar with the stop sign, and knew what it meant." Instead of the bicyclist "venturing into Betty Street" as the majority holds, the trial court held the bicyclist "attempted to cross the intersection on his bicycle at a fast rate of speed and come on to Betty Street. . ." Tr. 152.
It is respectfully submitted the majority failed to apply the rule that:
Where evidence is before the trier of fact which, upon a reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, the appellate court should not disturb this factual finding absent manifest error. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may believe its own evaluations and inferences are as reasonable. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
The majority summarized portions of the testimony, but did not quote from the trial judge's carefully considered written reasons.
The majority's key factual determination which differs with that of the trial court is the speed of the Derouen small sized Oldsmobile stationwagon. The trial court held that when brakes were applied Miss Derouen (who was almost sixteen at the time) was travelling between 30 and 34 mph. The majority finds her speed to have been between 40 and 50 mph. This is based on two findings by the majority1) all four tires were effectively braking for a distance of 102 feet, and 2) the black topped road surface was ideal. The record supports the trial court and not the majority as to both factors.
As to this first finding, it should be noted the skidmarks were not measured. The investigating officer testified he only stepped off the distance. Is there not room for a "reasonable inference" that from prior testimony in other cases the trial court knows this officer's steps are not accurate but instead his steps indicate longer measurements than actually exist? And it was positively established that only three of the Derouen vehicle's four tires were braking and most of this braking occurred while the stationwagon was sliding in a direction to the left of the direction it was facing. This occurred because the left front tire had no braking effect. A beer can was found embedded in the left front tire at the point where the rubber meets the road. Under these facts the majority erred in using the stopping/distance charts applicable where all four tires were effectively stopping the test vehicles in a straight line.
Secondly, one independent and most responsible witness testified the hardsurfaced right-of-way road had small bits of shell and pea gravel on it. Photographs in evidence support this testimony. The trial court was not in error in accepting an inference that the road surface was less than ideal. Relevant here is the fact that there was no expert testimony to reconstruct the *326 accident or to establish the speed of the car based on skidmarks and road conditions.
It is respectfully submitted that the trial court's reasonable evaluations of credibility and reasonable inferences of fact are as reasonable as the majority's evaluations and inferences.
The majority does not mention one of the trial court's essential factual determinationsthat impact occurred near the middle of Betty Street "somewhere around the east side of a continuation of Fanny Street." There is no error in this conclusion for this is exactly the location of impact assigned by the investigating officer's sketch in evidence at Tr. 151. This is in turn relevant to one of the majority's grounds for reversal.
I read the majority opinion to hold the bicyclist was one of a group of children and the motorist should have slowed because she saw these children "in the area." As to the motorist having seen children in the yard, the trial court expressly held "there is no evidence as to just exactly how close they were to the street." The record does not suggest these children were close enough to the road to cause concern on the part of the oncoming right-of-way motorist. Nor is there a suggestion in this record that these children who were playing in the yard might have placed the motorist on notice that a bicyclist might dart from an obscrued street through a stop sign at high speed. This is related to another key error in the majority's decisionthat "there were no obstructions to (Miss Derouen's) vision." This suggests the motorist should have seen the bicycle approaching the stop sign at high speed.
On these findings the majority aligns this case with Kelly v. Messina, 318 So.2d 74, (La.App. 4 Cir. 1975). In Kelly, the motorist saw a line of four bicyclists a substantial period of time and from a substantial distance before the child turned his bicycle into his traffic lane, but nevertheless continued driving at an excessive rate of speed the facts in the instant case do not remotely resemble those in Kelly.
The trial court expressly found the motorist "applied her brakes as soon as she saw young Bergeron, and the Court does not believe that she could see him for a great distance down Fanny Street." The evidence to support the trial court's conclusion was given by an independent witness who lives in the vicinity of the accident. She testified she wanted to determine how the accident occurred and carefully studied the motorist's approach to the accident. She found the motorist's vision of Fanny Street was obscured by trees, especially a cedar tree which was "heavy at the bottom." The view was also obscured by a growth of pampas and wisteria bushes which were thick at this time of the year, "so the view is blocked somewhat." Tr. 273. It is respectfully submitted the trial court's factual finding is again supported by the evidence.
The majority has based its reversal, in part, on a presumption against the right-of-way motorist for failing to call her guest passenger who was a friend at the time of the accident. On the basis of three decisions, the majority presumes the guest passenger's testimony would be adverse to the motorist. These cases are readily distinguished.
In Marshall v. Southern Farm Bureau Casualty Co., 204 So.2d 655 (La.App. 3 Cir. 1967), the presumption was applied against the brother of the decedent where the presumption is properly applied. Furthermore the presumption was used to affirm the jury determination. 204 So.2d at 670 [headnote 8]. In New Amsterdam Casualty Company v. Culotta, 230 So.2d 339 (La.App. 4 Cir. 1970), the presumption was again used to affirm the trial court, not to overrule the trial court's factual determination. In all probability the triers of fact (in the first a jury, in the second the trial judge) applied the presumption. The trial court knows a lot that doesn't get in the record. For instance, in the instant *327 case it was suggested the guest passenger had been confined in a hospital under the trial judge's order. How could the trial judge apply an inference against the motorist under these circumstances?
The citation of King v. Jarvis, 144 So.2d 616 (La.App. 4 Cir. 1962) as authority for this presumption is interesting. The court there acknowledge the rule but refused to apply it and affirmed the trial court.
It is respectfully submitted first that the rule does not apply to an unrelated guest passenger, and second, if the rule may be applied, it should be used to affirm the trial court whose duty it is to distill the evidence and make "reasonable inferences of fact." The rule should never be used to reverse a trial court whose knowledge concerning availability of witnesses far exceeds the bounds of the transcribed record.
Relevant to the trial court's overview of this case is the time sequence. This accident occurred May 14, 1971. Suit was filed May 12, 1972. The first effort to bring the matter to trial (so far as the cold record indicates) was taken on March 28, 1974 when plaintiff noticed the driver that her discovery deposition would be taken. The case was tried and decided in June of 1974. The trial court might have inferred plaintiff did not value the claim as a serious one.
The trial court reasoned "the child darting out on a rapidly moving bicycle was a contributing factor to the accident and recovery on (the child's) behalf is barred under the doctrine of contributory negligence which has been measured by the court in the light of his age and understanding." Tr. 154. I am unable to find manifest error in this factual determination.
If Canter v. Koehring Company stands for the quoted principal, supra, I respectfully submit we should affirm the trial court decision which has a reasonable factual basis.
I respectfully dissent.