442 So.2d 485 (1983)
Guinn BOSSIER and Hilma E. Bossier, Plaintiffs-Appellees,
v.
The DESOTO GENERAL HOSPITAL, Defendant-Appellant.
No. 15491-CA.
Court of Appeal of Louisiana, Second Circuit.
November 7, 1983.
Writ Denied January 6, 1984.
*487 Watson, Blanche, Wilson & Posner by Peter T. Dazzio and George K. Anding, II, Baton Rouge, for defendant-appellant.
Rothell & Cohn, Ltd. by David A. Rothell, Mansfield, for plaintiffs-appellees.
Before PRICE, HALL, MARVIN, SEXTON and NORRIS, JJ.
HALL, Judge.
In the early morning hours of October 12, 1979, Mrs. Hilma E. Bossier, a patient at The DeSoto General Hospital, fell in her hospital room and fractured her hip and knee. Mrs. Bossier, joined by her husband, filed suit for damages against the hospital, alleging the hospital's negligence in failing to provide adequate care. After a jury trial a verdict in the form of answers to special interrogatories was returned finding the hospital guilty of negligence which was the proximate cause of Mrs. Bossier's injuries, awarding Mrs. Bossier $125,000 for her injuries and awarding Mr. Bossier $23,516 for special damages. From a judgment rendered in accordance with the jury verdict the defendant appealed.
On appeal the defendant hospital makes the following specifications of error:
"Specification of Error No. I
"The jury erroneously concluded that De-Soto General Hospital was guilty of negligence.
"Specification of Error No. II
"The jury erroneously concluded that negligence on the part of DeSoto General Hospital was the proximate cause of the accident.
"Specification of Error No. III
"The jury clearly abused its discretion in that the amount of its verdict is clearly excessive.
"Specification of Error No. IV
"DeSoto General Hospital was substantially prejudiced by the failure of a juror to reveal, in response to questioning on voir dire, the existence of his ongoing representation in another matter by counsel for plaintiff.
"Specification of Error No. V
"The trial court erroneously failed to sustain defendant's objections to plaintiffs' counsel's closing argument and demonstrative techniques utilized therein, which were highly prejudicial to defendant's case, and erroneously declined to grant the application for new trial based upon the prejudice suffered by defendant through the prejudicial commentary and demonstrative techniques utilized by counsel for plaintiffs and objected to by counsel for defendant."
On October 4, 1979, Mrs. Bossier, then 57 years old, was admitted to The DeSoto General Hospital by her physician for treatment of arthritis and bursitis of the neck and shoulders. On October 12 at approximately 5:30 a.m., while still undergoing treatment at the hospital, she fell and fractured the femur and knee of her right leg. She was transferred to Schumpert Medical Center in Shreveport for evaluation and treatment of her injuries. Both injuries required corrective surgery and combined to produce a degree of permanent disability.
The major component of plaintiff's treatment at the hospital was intensive drug therapy designed and intended to relieve *488 the pain and muscle spasms plaintiff had been experiencing associated with her arthritis and bursitis. The doctor prescribed and plaintiff was taking daily doses of several muscle relaxers and pain killers, some of which contained narcotic agents. This regime of drug therapy continued from the time of plaintiff's admission through the time of her fall about a week later.
During her stay at the hospital the doctor prescribed and plaintiff received "routine care" consisting of the use of partial or short bedrails on her bed while sleeping, the routine periodic monitoring of her condition by hospital personnel on approximately an hourly basis, and the availability of assistance in ambulation upon request. "Routine care" such as Mrs. Bossier received did not include the use of restraints and affirmative warning to the patient not to attempt unaided ambulation, or constant supervision or observation of the patient by a family member or a hired nurse or sitter.
No one witnessed plaintiff's fall. Plaintiff had no independent recollection of the facts surrounding her fall. Several nurses responded to plaintiff's cries after her fall and found her lying near the foot of the bed on her back. The head of plaintiff's bed was facing south and her head was facing east when she was found. Her bed was equipped with partial or short side rails which were up at the time of the accident. Both the bed and her bedclothes were wet with urine. Several of the nurses testified that Mrs. Bossier told them at the time they found her or later in the morning that she had a dream that she had to get somewhere in a hurry and one of the nurses said she told her she ran off the foot of the bed. Plaintiff did not remember making these statements. When admitted to the Schumpert Medical Center later in the day, Mrs. Bossier told the doctor there that she did not know how she fell.
Plaintiff had experienced no unusual difficulty in getting around prior to her fall. The night before the night she fell she was seen by nurses walking around the hall during the middle of the night. However, plaintiff testified that in getting up to go to the bathroom she had begun to feel quite weak and would be slightly dizzy and had to be especially careful when she took a bath. Her husband and friends and relatives who visited her at the hospital testified that she appeared groggy, drowsy and the like. One witness said she said she "felt like she was flying."
Prior to the fall Mrs. Bossier had received no warning from either the doctor or the hospital personnel against attempting unaided ambulation and had received no instructions or directions concerning having someone stay with her during the night. Her husband stayed with her during the daytime but went home at night. He testified that had he been advised to have someone stay with Mrs. Bossier he could and would have made arrangements to do so.
Specifications of Error Nos. I and II
Defendant contends that the jury erroneously concluded that The DeSoto General Hospital was guilty of negligence which was the proximate cause of the accident and plaintiff's injury.
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from the dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and facts of the particular case. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). However, a hospital is not an insurer of a patient's safety and is not required to guard against or take measures to avert a situation which a reasonable person would not anticipate as likely to happen under the given circumstances. Killgore v. Argonaut-Southwest Insurance Co., 216 So.2d 108 (La.App. 2d Cir.1968).
The primary issue presented by this appeal is whether the defendant breached *489 the duty enunciated above as it applied to this particular plaintiff under the particular circumstances of this case. After review of the entire evidence we conclude that the finding of the jury that the hospital was guilty of negligence which was a proximate cause of the plaintiff's injury is not manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Stated otherwise, we conclude that the evidence is sufficient to support a finding by the trier of fact that the hospital breached its duty of due care to the plaintiff patient and that the breach of duty was a legal cause of the accident and plaintiff's injury.
Both the level of supervision and the precautions taken to insure Mrs. Bossier's safety during her stay at the hospital were those furnished as a matter of standard operating procedure by the hospital to all patients. Her bed was equipped with partial or short side rails, her condition was periodically monitored by hospital personnel on approximately an hourly basis, and she would have received aid in ambulating had she requested it. No special procedures beyond these standard operating procedures furnished to all patients were furnished to Mrs. Bossier.
Stricter programs or procedures for monitoring a patient's condition as well as additional precautions to further restrict a patient's ambulatory movements in order to insure personal safety existed and were used by the hospital for some patients at the time of Mrs. Bossier's fall. Among these procedures and precautions were the use of full-length side rails on a patient's bed, the use of restraints to insure that a patient did not leave the bed unaided, affirmative warnings by hospital personnel for a patient not to attempt unaided ambulation, and continuous supervision or observation of a patient by a family member or nurse furnished at the family's expense. One or more of these procedures or precautions were utilized by the hospital in those cases not considered "routine". Mrs. Bossier's case was treated as "routine" and she did not receive the benefit of any of these additional procedures or precautions.
Mrs. Bossier's treating physician, and doctors who served on the medical review panel, testified that in their opinion only routine care was called for, and that the procedures followed by the hospital in the care of Mrs. Bossier were proper and adequate.
Plaintiff was undergoing intensive drug therapy utilizing various muscle relaxers and pain killers, some of which contained narcotic agents. This therapy was designed and intended to relieve the pain and muscle spasms plaintiff had been experiencing by placing plaintiff in a sedate and less alert condition. Plaintiff's treating physician testified that the program of therapy was achieving the desired results and, in fact, he intended to discontinue or reduce the drug therapy the next day after plaintiff's fall.
Among the most common side effects associated with the drugs plaintiff was taking are sedation, drowsiness, and dizziness. Furthermore, plaintiffs' expert witness, a specialist in clinical pharmacy with excellent credentials, testified that the drugs utilized in plaintiff's treatment had certain "potentiating" and "residual" effects. The essence of this testimony was that the drugs would build up in the patient's system over a period of time and that, when taken in conjunction with each other, the effects of the drugs administered were substantially magnified. Both the hospital personnel and plaintiff's treating physician were aware of and familiar with these drugs and their common side effects and potentiating and residual qualities.
It is apparent from the evidence that, while sleeping, Mrs. Bossier felt an urgent need to go to the bathroom and that while attempting to do so in a sleepy or dreamlike state either fell from the bed while trying to get out of bed or fell after she got out of bed while trying to walk to the bathroom. More probably than not the effects of the drugs Mrs. Bossier was taking, serving their intended purpose and producing their known side effects, substantially contributed to Mrs. Bossier's inability to *490 successfully get out of bed and make it to the bathroom and to her fall which resulted in serious injuries to her.
It was reasonable for the jury to conclude that, considering the drug therapy treatment being administered to Mrs. Bossier, the hospital had a duty to provide more than routine care to Mrs. Bossier in order to protect her from just the kind of foreseeable accident which occurred. The duty of care owed by the hospital to this particular plaintiff encompassed the duty to undertake reasonable precautions designed to prevent or at least make it difficult for the patient to attempt to ambulate without assistance during the night.
Had any one or more of the additional precautions mentioned previously been taken by the hospital personnel it is more probable than not that the accident would not have happened. The short bedrails in use are designed to do no more than to keep a patient from rolling over and falling out of the bed. Had the bed been equipped with long side rails it would have been very difficult for Mrs. Bossier to get out of the bed without awakening sufficiently to be able to call for assistance or to more safely handle the situation on her own. Had Mrs. Bossier or her husband been advised of the importance of having someone with her during the night or been specifically directed to do so, such arrangements would have been made. With another person in the room the accident almost certainly would not have happened. Had Mrs. Bossier been specifically advised and instructed not to get out of bed by herself at night, there is a distinct possibility that even in her drowsy state, particularly after a week of following such instructions, she would have called for assistance.
The defendant hospital's failure to take any of these additional precautions in light of the plaintiff's condition and treatment was a breach of its duty to protect the patient from the dangers that might result from the patient's drug-induced incapacity. The duty breached by the hospital encompassed the risk of just such an accident as happened in this instance. Cause in fact exists because, but for the failure of the hospital to take adequate precautions, the accident probably would not have happened. Defendant's breach of duty owed to the plaintiff was the legal cause of the accident and injuries and the defendant is liable for the damages sustained by the plaintiff.
Defendant contends that it fully discharged its obligation of care to the plaintiff by following the treating physician's orders. The evidence discloses that the hospital personnel were well aware of the nature of plaintiff's therapy and the risk associated with it. A hospital has an obligation and duty of care to its patients which is independent of any obligation or duty owed by the treating physician. Hunt v. Bogalusa Community Medical Center, supra; Free v. Franklin Guest Home, Inc., 397 So.2d 47 (La.App. 2d Cir. 1981). In the area of the patient's safety and care while undergoing treatment, the absence of specific orders by the treating physician is not fatal to a plaintiff's personal injury claim based on the hospital's negligence. Smith v. West Calcasieu-Cameron Hospital, 251 So.2d 810 (La.App. 3d Cir.1971). The patient is entitled to rely upon the hospital's expertise and independent professional judgment to supplement the treating physician's direct orders when necessary to afford the patient the safe and reasonable health care the hospital is obligated to provide. Therefore, assuming the hospital strictly followed the treating physician's order in this case, strict adherence to the physician's orders cannot excuse the failure to provide safe and reasonable care to the patient, nor preclude a finding of negligence on the part of the hospital.
Defendant relies on four cases which are factually similar to the instant case to support its contention that defendant did not breach the duty owed to the plaintiff. Recovery was denied in Guidry v. State, Department of Hospitals, 317 So.2d 222 (La. App. 3d Cir.1975); Noble v. Insurance Company of North America, 248 So.2d 12 (La.App. 1st Cir.1971); Killgore v. Argonaut-Southwestt *491 Insurance Co., supra; and De Blanc v. Southern Baptist Hospital, 207 So.2d 868 (La.App. 4th Cir.1968). These cases are distinguishable from the instant case on their facts, and illustrate the principle that each case of this nature must be judged on its own particular facts and circumstances. Compare Hunt v. Bogalusa Community Medical Center, supra, and Smith v. West Calcasieu-Cameron Hospital, supra, cited by the plaintiffs, in which recovery was allowed under similar facts. See also Daniel v. St. Francis Cabrini Hosp., etc., 415 So.2d 586 (La.App. 3d Cir.1982); Mullins v. Our Lady of the Lake Hosp., Inc., 402 So.2d 170 (La.App. 1st Cir.1981); Leavitt v. St. Tammany Parish Hospital, 396 So.2d 406 (La.App. 1st Cir.1981); Williams v. Sisters of Incarnate Word, etc., 341 So.2d 1299 (La.App. 3d Cir.1977); Jenkins v. Bogalusa Community Med. Center, 340 So.2d 1065 (La. App. 1st Cir.1976).
The jury's finding of liability was not manifestly erroneous or clearly wrong.
Specification of Error No. III
Defendant contends that the amount of the award is clearly excessive and amounted to an abuse of discretion. The amount of the award for general damages was $125,000 and the award for special damages was $23,516.
The accident occurred October 12, 1979. When Mrs. Bossier was taken to the Schumpert Medical Center in Shreveport her injury was diagnosed as an intertrochanteric fracture of the right hip/femur. The doctor placed Mrs. Bossier in traction and on the next day performed surgery on the hip, permanently implanting a metal plate with screws. Mrs. Bossier was hospitalized until October 30, a total of 18 days. After the passage of some time Mrs. Bossier was finally able to begin bearing weight on her right leg. At about this point in time she became aware that something was seriously wrong with the knee of the same leg. When she did not respond to clinical therapy she was readmitted to the hospital on May 14, 1980 for an arthroscopy of the right knee which required three days hospitalization. This test revealed that she had also sustained, as a result of her fall, a tear to the right lateral medial meniscus and a fracture of the tibial plateau of the knee with secondary degenerative post-traumatic arthritic changes. On June 11, 1980 Mrs. Bossier was again admitted to the hospital and the doctor performed a hemiarthropalsty to the knee, implanting a a plastic surface on the head of the femur to articulate or make contract with the tibial plateau. Mrs. Bossier was released from the hospital 14 days later. Therapy for the knee during the stay in the hospital and afterwards was very painful.
Mrs. Bossier was last seen by the doctor in November 1980, more than a year after her accident.
The doctor assigned a 10 percent permanent disability of the right leg due to the hip injury and a 25 percent permanent disability of the right leg due to the knee injury. He testified that plaintiff will have arthritic problems as a result of the knee injury and will likely have to repeat the entire procedure on the knee because the implant simply wears out and has to be replaced.
Mrs. Bossier testified, corroborated by her husband, that the accident has greatly changed her life from one of an active person to one who is no longer able to do the things that she once did and enjoyed. Both testified that since the accident Mrs. Bossier has not had one day free of pain.
Defendant cites several cases involving allegedly similar injuries in which the awards were substantially less than the award to Mrs. Bossier: Fontenot v. American Fidelity Fire Ins. Co., 386 So.2d 165 (La.App. 3d Cir.1980)$5,000; Parker v. South La. Contractors, Inc., 370 So.2d 1310 (La.App. 1st Cir.1979)$42,000; Teal v. Allstate Ins. Co., 348 So.2d 83 (La.App. 4th Cir.1977)$15,000; Sansonni v. Jefferson Parish School Bd., 344 So.2d 42 (La. App. 4th Cir.1977)$45,000; Panek v. Gulf Ins. Co., 341 So.2d 46 (La.App. 3d Cir.1976)$80,000; Thibodeaux v. Fireman's Fund Insurance Company., 325 So.2d 318 (La.App. 3d Cir.1975)$15,000; *492 Lowenburg v. Labor Pool of America, Inc., 296 So.2d 846 (La.App. 4th Cir.1974)  $50,000; Garner v. Crawford, 288 So.2d 886 (La.App. 1st Cir.1973)$15,000. We have reviewed those cases and find that the injuries and the effects of the injuries on the plaintiffs in those cases are not closely similar to the circumstances involved in this case. In support of the award plaintiffs cite Merrell v. State, Through Dept. of Transp., 415 So.2d 660 (La.App. 3d Cir. 1982) $200,000; Dugas v. Jiminez, 413 So.2d 531 (La.App. 4th Cir.1982)$210,000; O'Donnell v. Fidelity General Ins. Co., 344 So.2d 91 (La.App. 2d Cir.1977)$85,500. Again, the cases are not closely similar to the instant case.
Mrs. Bossier sustained two serious injuries to her right leg requiring surgery on two occasions, hospitalization for several weeks, and medical treatment for more than a year. She has a significant permanent disability of the right leg. She experienced considerable pain and continues to have pain on a daily basis. Her activities have been limited by the injuries. We find no abuse of the much discretion of the trier of fact in the award of $125,000 general damages to Mrs. Bossier. No showing is made that there was any error in the award of special damages to Mr. Bossier on behalf of the community.
Specification of Error No. IV
Defendant contends that it was substantially prejudiced by the failure of a juror to reveal, in response to questioning on voir dire, the existence of his ongoing representation by counsel for plaintiffs in another pending lawsuit. Defendant emphasizes that this matter takes on added significance because the jury verdict was by a 9 to 3 vote and the juror in question was one of the nine who voted in favor of the verdict. Under LSA-C.C.P. Art. 1795, nine is the minimum number of jurors who must concur to render a verdict. Defendant argues that a new trial should have been granted because of jury misconduct under the provisions of LSA-C.C.P. Arts. 1814, 1971, 1972, and 1973.
Although the record does not contain a transcript of a colloquy between counsel and the trial judge prior to voir dire examination, it appears from statements in the briefs of both counsel and statements made during argument of the motion for new trial that, prior to voir dire examination, counsel for the plaintiffs advised counsel for the defendant and the court that his office had represented the juror in question, Huey Bailey. Additionally, plaintiffs' counsel disclosed a prior employment relationship with another juror and also with the child of yet a third juror. These disclosures were made so that the jurors involved could be excused at that time if deemed appropriate. Defense counsel indicated that he wished to observe these individuals during their examinations and then decide whether or not they should be challenged for cause or peremptorily.
During voir dire examination, the following colloquy occurred between Bailey and plaintiffs' counsel:
"Q. You have known me, haven't you?
"A. Yes, sir.
"Q. I have represented you before?
"A. Yes.
"Q. Would that have any bearing on your ability to give both these parties a fair trial?
"A. No, it wouldn't.
Defense counsel's examination of this juror is rather perfunctory and is set forth in its entirety below:
"Q. Mr. Bailey, I didn't catch your employer?
"A. I work for the Jenkins Estate at Jenkins Liquor Store.
"Q. Have you ever been a juror before?
"A. No, I haven't.
"Q. Have you ever been a party to a lawsuit before, either as a Plaintiff or as a Defendant?
"A. No, I haven't.
"Q. When you were hospitalized before were you satisfied with the treatment you received and everything went alright with you?

*493 "A. Yes.
"Q. By the same token or on the other side of the coin, can you require as the Judge will tell you will be required the Plaintiff must prove its case before you award him damages, leaving out any sympathy you might have for Mrs. Bossier?
"A. Yes.
"Q. Is there any reason at all that you can think of that you wouldn't be able to be a fair and impartial juror in this case?
"A. None whatsoever, no."
In its motion for new trial the defendant alleged, and plaintiffs' counsel admits, that at the time of trial and thereafter the law firm of plaintiffs' counsel represented the juror in an ongoing pending lawsuit. The record contains no information about the nature of the suit. Defendant argues that the juror's answer to the question of whether he had ever been a party to a lawsuit was false and that the failure of the juror and of plaintiffs' counsel to disclose the ongoing representation deprived defendant of the opportunity to use a challenge for cause or peremptory challenge to remove this juror. Furthermore, defendant contends these circumstances tainted the decision-making process in this case, prevented the impartial administration of justice, and constituted grounds for a new trial.
Stating that there are no Louisiana cases in point, defendant relies on three decisions rendered in the states of Mississippi and Florida, Marshall Durbin, Inc. v. Tew, 381 So.2d 152 (Miss., 1980); Mississippi Power Company v. Stribling, 191 Miss. 832, 3 So.2d 807 (Miss.1941); and Skiles v. Ryder Truck Lines, Inc., 267 So.2d 379 (Fla.App. 2d Dist.1972). In each of those cases there was a failure on the part of a juror and counsel to disclose material facts relating to the representation of the juror by an attorney involved in the trial. In those cases the courts held that concealment of material information had deprived a party to the action of the opportunity to exercise challenges, either peremptory or for cause, that the juries were therefore improperly established and the party was deprived of his statutory and constitutional right to trial before a fair and impartial jury. The courts held that a new trial was required, irrespective of a showing that bias or prejudice caused an unjust verdict. It should be noted, however, that in the Skiles case the court held that a new trial will be granted when a prospective juror conceals a material fact sought to be elicited by questions asked during voir dire examination which is conducted in a diligent manner and where the counsel's examination in no way contributes to the failure to disclose the alleged bias or partiality.
Under Louisiana law not every instance of jury or juror misconduct necessitates the granting of a new trial or the remand of a case for a new trial. Under the provisions of LSA-C.C.P. Arts. 1814, 1971, 1972, and 1973, as read together, a new trial is mandated only upon a showing of jury misconduct which is of such a grievous nature as to preclude the impartial administration of justice. Otherwise, the granting of a new trial is left to the sound discretion of the trial court. Improper behavior by a jury is not defined but must be determined by the facts and circumstances of the particular case. Blandino v. Brown Erection Co., Inc., 341 So.2d 577 (La.App. 2d Cir.1977).
Furthermore, even where there is jury misconduct or other circumstances which would bear on the validity of the verdict or the weight to be given to it, a Louisiana appellate court is required to review both the facts and the law and to render any judgment which is just, legal, and proper upon the basis of the record before it. Art. 5, Section 10, Louisiana Constitution and LSA-C.C.P. Art. 2164. Where a jury verdict must be disregarded because of trial error or jury misconduct, the appellate court should nevertheless ordinarily undertake an independent evaluation of the facts and adjudicate the controversy before it. However, where the weight of the evidence is so nearly equal *494 that a firsthand view of the witnesses is essential to a fair resolution of conflicting evidence and issues, the case should be remanded for a new trial. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La. 1980); Boyette v. Auger Timber Co., 403 So.2d 800 (La.App. 2d Cir.1981).
As previously noted, the juror or jury misconduct issue in this case takes on added importance because the juror in question was one of the nine who concurred in the verdict, nine being the minimum number necessary to reach a verdict. Further, our affirmance of the jury's finding of liability in this case rests on giving full weight to the findings of the jury, the trier of fact, and application of the manifest error or clearly wrong rule of appellate review. In this case the weight of the evidence is so nearly equal and a fair resolution of the conflicting evidence and issues depends so strongly on a firsthand view of the witnesses and credibility evaluations only a trier of fact could fairly make, that it would be difficult for this appellate court to fairly find a preponderance of the evidence from the cold record. Accordingly, it is necessary that we determine whether there was jury or juror misconduct in this case of such a nature as to indicate that impartial justice has not been done or that the jury verdict was rendered by a jury that was anything less than fair and impartial.
In this case the defendant has shown only the presence of an individual on the jury who might have had some reason to be partial in favor of the plaintiffs' counsel. There is, of course, no evidence establishing that the juror was partial or that he exercised undue influence upon other jury members. During voir dire examination of the juror, the juror stated that he would decide this case based on the facts and the law as given him and that there existed no impediment to his impartial deliberation. The mere presence of an individual on the jury who was being represented by plaintiffs' counsel in another entirely unrelated matter in and of itself does not establish misconduct or partiality sufficient to preclude the impartial administration of justice as required by LSA-C.C.P. Art. 1814 and to mandate the granting of a new trial. See Rains v. Diamond M. Co., 396 So.2d 306 (La.App. 3d Cir.1981).
The heart of the defendant's complaint concerning this juror is the possibility of partiality based on his representation by the plaintiffs' counsel. The fact that there was an attorney/client relationship between plaintiffs' counsel and the juror was revealed by plaintiffs' counsel prior to voir dire examination and by the juror in answer to plaintiffs' counsel's question on voir dire examination. If counsel for defendant was concerned about the juror's impartiality because of his relationship to plaintiffs' counsel, then it was incumbent upon defendant's counsel to pursue the nature and extent of the relationship in his voir dire examination of the juror, which in this case was most perfunctory. We are unable to discern how the fact that counsel's representation of the juror was in a current matter as distinguished from a concluded matter would affect the possibility of partiality on the part of the juror.
When asked if he had ever been plaintiff or defendant in a lawsuit, the juror replied that he had not, which was later revealed to be an incorrect answer. It should be noted that this same question was asked by counsel to each and every potential juror on voir dire examination and was obviously directed toward the juror's possible bias for or against plaintiffs or defendants or in connection with particular kinds of claims, and was not directed toward the juror's relationship with counsel for plaintiffs in this case. Counsel for defendant elected not to pursue the relationship with plaintiffs' counsel by further questioning and elected not to challenge the juror peremptorily or for cause.
Our review of what transpired in this regard leads us to conclude that although the answer of the juror to the question *495 concerning whether or not he had ever been a plaintiff or defendant in a lawsuit was incorrect, neither the juror nor plaintiffs' counsel intentionally misled defendant's counsel or the court concerning the relationship between the juror and plaintiffs' counsel. We find no jury or juror misconduct in this case indicating that impartial justice has not been done or indicating that the jury verdict should not be given full weight as the fair and impartial finding of the trier of fact.
Specification of Error No. V
Defendant complains that it was prejudiced by unfair and highly prejudicial arguments and demonstrative techniques made by plaintiffs' counsel in closing argument. Specifically, defendant complains of counsel displaying 120 Tylenol tablets to the jury, of counsel's comment on the failure of defendant to call a nurse as a witness, and of counsel's comment to the effect that defendant's case was based on the theory that the accident was caused by the negligence of plaintiff's physician. The bottle of pills was displayed to the jury to dramatize the number of pills plaintiff took during the time she was in the hospital prior to the fall.
The arguments do not appear to have been improper or beyond the limits of fair advocacy, nor designed to unduly inflame the jury. We discern no impropriety or undue prejudice and find this specification of error to be without merit.
Decree
For the reasons assigned, the judgment of the district court is affirmed at appellant's costs.
Affirmed.
SEXTON, J., dissents and assigns written reasons.
PRICE, J., dissents for the reasons assigned by SEXTON, J.
SEXTON, Judge, dissenting.
In order to find for the plaintiff, this jury must have, (a) agreed with plaintiff's strenuous assertions that the hospital was involved in a "cover-up" of active faulti.e., failing to raise the bedrails, erroneously dispensing too much medication, etc.or, (b) determined, as the majority here holds, that the hospital had a duty to do something more because of the nature of the drug therapy plaintiff was undergoing.
As to the former, in my view any such finding is not supported by the record and is therefore manifestly erroneous.
As to the latter, I disagree as a matter of law. There were no complaints to the doctor or to the nurses by the plaintiff or her husband at any time prior to the accident that she was dizzy, disoriented or unduly drowsy. At four a.m. the night before the accident she was seen walking the halls of the hospital complaining of inability to sleep. Because of her progress, her physician had determined to discharge her within a day or so, and had in fact reduced her medication on the day previous to the accident.
The testimony of the expert pharmacologist, as I view it, is not that side effects are to be expected from the regime of drug therapy plaintiff was undergoing, but that they were possible. There are possible side effects to almost every medication, even those which do not require a doctor's prescription. However, there was nothing known by the physician or the hospital which should have given notice that this patient was about to have a problem because of too much medication. Furthermore, long bedrails, warnings, and/or a sitter would not have prevented this accident. Additionally and parenthetically, I believe that the position of the majority has the potential to cause an escalation of the cost of hospital care without any significant medical benefit.
I respectfully dissent.