415 So.2d 660 (1982)
Iva O. MERRELL, Plaintiff & Appellee,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant & Appellant.
No. 8863.
Court of Appeal of Louisiana, Third Circuit.
May 26, 1982.
*661 Robert H. Carpenter, Jr., and Owen M. Goudelocke, of Mengis, Durant & Carpenter, Baton Rouge, for defendant & appellant.
Thomas & Dunahoe, Edwin Dunahoe, Natchitoches, for plaintiff & appellee.
*662 Before CULPEPPER, FORET and DOUCET, JJ.
CULPEPPER, Judge.
The plaintiff, Iva O. Merrell, sues the State of Louisiana, through the Department of Transportation and Development (hereinafter "Department") for damages for personal injuries arising out of a two vehicle accident which occurred in Natchitoches Parish on November 26, 1978. The trial court held the Department was negligent in failing to maintain a safe highway and shoulder, which negligence was the sole cause of the accident. The Department appeals.
On appeal, the Department contends:
1) The trial court was clearly wrong in finding that a hazardous condition existed, and that the Department had notice thereof.
2) The trial court was clearly wrong in finding that Iva O. Merrell was not contributorily negligent.
3) The trial court abused its discretion by awarding excessive general damages and future loss of earnings.

FACTS
The accident which gave rise to this suit occurred at approximately 4:40 p. m. on Sunday, November 26, 1978, on Louisiana Highway 1 in Natchitoches Parish. The plaintiff, accompanied by two passengers, was proceeding northward on Highway 1 to attend evening church services. Due to heavy rains, Mr. Merrell was operating his vehicle with the headlights on and windshield wipers in operation. Just after crossing what is known as Monette's Ferry Bridge, at a point at which the shoulder of Highway 1 changes from one of asphalt pavement to one consisting of dirt and gravel, the right front tire of plaintiff's automobile dropped off the pavement and into a hole or rut in the gravel shoulder at the edge of the paved portion of the highway. At this point, the plaintiff lost control of his automobile, which veered into the south bound lane where it collided with a south bound dual wheel pickup truck. Mr. Merrell suffered severe injuries as a result of the accident.
The trial court concluded that the Department was negligent in failing to maintain a safe highway and shoulder, and that the evidence showed no contributory negligence on the part of the plaintiff which would relieve the Department of its liability for his injuries. He held that the condition of the road and shoulder was in the nature of a trap causing Mr. Merrell to lose control of his vehicle. He further found that the Department had adequate notice of the defect and was negligent either in failing to observe it, or in seeing it and failing to correct it within a reasonable time. In addition to awards for past loss of wages and past and future medical expenses, the court fixed the award for future loss of earnings at $368,000 and for past, present and future pain, suffering, disfigurement and disability at $200,000.

NEGLIGENCE OF THE DEPARTMENT
The general duties of the Department toward the traveling public were stated by the Louisiana Supreme Court in Sinitiere v. Lavergne, 391 So.2d 821 (La.1980);
"[1] It has been repeatedly stated that the Department is not a guarantor of the safety of travelers but, rather, owes a duty to keep the highways and its shoulders reasonably safe for non-negligent motorists. Liability based upon negligence is imposed when the Department is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time.3
Since road shoulders are only designed for temporary use when a motorist finds himself off the roadway, the Department's duty of care is generally discharged at a level of construction and maintenance less than that required for the primary road surface. However, an implicit necessity for the functional use of a shoulder is a connection between the roadway and shoulder that allows for safe gradual movement from one to the other.

*663 [2,3] The duty to maintain reasonably safe highways and shoulders extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition.
* * * * * *
In Rue, [372 So.2d 1197 (La.1979)] supra, the rule was clarified to include persons who drove onto the shoulder inadvertently where there was neither knowledge nor reason to know of either a defective condition of the shoulder itself or any other condition that would make such action hazardous (such as a car on the shoulder of the road)."
The trial court found as a fact that a hazardous shoulder condition did exist at the site of this accident, that the Department had notice of its existence, and that the plaintiff encountered this hazard which caused him to lose control of his vehicle. The Department contends the evidence as a whole is insufficient to support these findings.
It is well settled that the test of the sufficiency of the evidence in a civil case, whether direct or circumstantial, is whether the evidence, taken as a whole, shows the fact sought to be proved is more probable than not. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972).
The plaintiff testified he was proceeding cautiously and, because he noticed oncoming traffic, moved his vehicle to the far right of the north bound lane after crossing the bridge. Because of low visibility due to the rainy condition, he was using the white lane marker on the right-hand side of the road as a guide. He stated that soon after he crossed the bridge, his right front wheel suddenly left the pavement, he felt a drop-off and a scraping sensation underneath the automobile, and then lost control.
Two sets of photographs taken by the Department were introduced into evidence. One set of these photos was taken exactly one month before the accident (It is unclear from the record exactly when the other set was taken). These pictures show a rut (we use this term for want of a better descriptive term) on the edge of the pavement in the angle formed by the end of the paved shoulder and the roadway as it continues with a gravel shoulder. They show that the white lane marker by which the plaintiff was guiding his automobile comes to an end at the point at which the paved shoulder ends, leading directly into this rut, and begins again to the north end of the rut. At this point the edge of the main travel portion of the highway has been eroded for a distance of some two to five feet and at least four inches in width, resulting in a rut. The length of two to five feet is based on the pictures and the observations of witnesses, since no measurements were taken.
Mrs. Doris Hale and Mrs. Elsie Vinsick testified that on November 14, 1978, 12 days before the plaintiff's accident, they were traveling in an automobile whose right rear tire dropped into this same rut while leaving the main travel portion of the roadway to go onto the shoulder, in order to avoid faster traffic approaching from the rear. Mrs. Hale, the driver, testified that due to the severity of the jar, she experienced difficulty in maintaining control of her vehicle, despite ideal weather conditions and a slow speed of 10 to 20 miles per hour. She stopped on the shoulder, and she and Mrs. Vinsick got out to look at the rut. Mrs. Hale testified that the rut appeared to be about six inches deep, and that the gravel shoulder had eroded away from the main travel portion of the roadway so that five to eight inches of the asphalt edge were visible.
The plaintiff's father, who also works for the Department, testified that at least two weeks before the accident he had noticed the broken off place in the same area. He stated that he did not tell his supervisor about it because such reports from employees were discouraged, and because he assumed that one of the crews working in that area would take care of it. Nor did he see any reason to mention it to his son.
The Department introduced the testimony of Troy Vascocu, the parish maintenance *664 superintendent, that the records kept during his general annual inspection of October 20-26, 1978 showed no particular problem in this area, and that he had noticed nothing he would consider to be a serious defect in driving this route on November 8, 13 or 16, nor in his regular inspection of routes on December 12, 1978. The only other evidence of the condition of the road in this area was the testimony of a Department employee that he worked on the shoulders of the section in which this accident occurred on October 27, 1978, November 20, 1978, and again in early December, 1978, and noticed no particular problem at any of these times. However, he had no independent recollection of the specific areas of the section in which he worked, or what was done in a particular area.
There are numerous cases in which an irregularity in the shoulder of the road has been held to constitute a hazardous condition. Many of these involved elevational differences between the roadway and the shoulder due to additional overlay of the road, generally ranging in height from slightly over two inches to four inches. See Sinitiere v. Lavergne, supra; Smith v. State, through Department of Transportation and Development, 412 So.2d 685 (La. App. 2d Cir. 1982); McDaniel v. State, through Department of Transportation and Development, 398 So.2d 88 (La.App. 3rd Cir. 1981), writ denied 404 So.2d 277, 279 (La. 1981); Edwards v. State, through Department of Transportation and Development, 403 So.2d 109 (La.App. 3rd Cir. 1981); Godwin v. GEICO, 394 So.2d 751 (La.App. 3rd Cir. 1981).
In Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979) the Supreme Court held that a rut at the highway's edge which caused the plaintiff to lose control of her car constituted a hazard to the reasonably prudent driver. See also Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir. 1980), writ denied 400 So.2d 211 (1981), and Acosta v. State, Department of Highways, 399 So.2d 1189 (La.App. 4th Cir. 1981), in which ruts in the shoulder of the highway were held to be a dangerous condition of the highway.
In light of the estimated depth of this particular rut of at least five inches, its position on the very edge of the main travel portion and the paved shoulder of the highway, and the fact that the white lane marker led directly into the rut, we discern no clear error in the trial court's finding that this condition did indeed pose a hazard to the reasonably prudent motorist. Arceneaux v. Domingue, 365 So.2d 1330 (1978).
Additionally, the finding that the Department was negligent in maintenance of the highway and its shoulder is amply supported by the record, since members of the public were aware of the rut, and the superintendent of maintenance testified to inspecting, or at least viewing, the area numerous times during the months of October and November of 1978. See Acosta v. State, supra; Jones v. Louisiana Department of Highways, 338 So.2d 338 (La.App. 3rd Cir. 1976). This finding will therefore not be disturbed on appeal. Arceneaux, supra.

NEGLIGENCE OF IVA O. MERRELL, JR.
Defendant contends the plaintiff's negligence in oversteering his automobile once it was on the shoulder was the true cause of the accident.
In Sinitiere v. Lavergne, supra, the Louisiana Supreme Court explained the rule of Rue v. State, Department of Highways, supra, by saying:
"In Rue, supra, this court stated that a motorist's duty to drive reasonably does not extend to the risk of injury from striking an unexpected and unexpectable hazard resulting from a negligently maintained highway shoulder. The reason for this statement was the jurisprudentially recognized rule that a motorist has a right to assume that highway shoulders are maintained in a reasonably safe manner in the absence of knowledge or reason to know of a defect. This language does not establish the highway shoulder as a `zone of recovery' for every straying motorist. *665 Rather, it states the simple principle that the law will not automatically bar a person from recovery or charge him with liability vis-a-vis third parties where the law does not charge that person with actual or constructive knowledge of an avoidable danger. Thus, if a person is chargeable with knowledge of a shoulder defect that could cause serious injury and, nevertheless, disregards his own safety and the safety of others, the law considers his actions in leaving the main travel portion of the roadway to be a breach of his duty to himself and to the others who can reasonably be expected to be injured by his actions. See Rodgers v. Department of Highways, 376 So.2d 1295 (La.App. 2nd Cir. 1979); Morrow v. Department of Highways, 377 So.2d 430 (La. App. 2nd Cir. 1979)."
We recognize that recovery by a party is barred by his contributory negligence if the record shows that he was aware of the defect in the shoulder and oversteered in an attempt to re-enter the main travel portion, or attempted re-entry at too high a speed. See Edwards v. State, Department of Transportation and Development, supra; Godwin v. GEICO, supra; Knotts v. State, Department of Highways, 395 So.2d 419 (La.App. 3rd Cir. 1981), writ denied 400 So.2d 669, 670 (La.1981).
Nevertheless, as this Court stated in McDaniel v. State, Department of Transportation and Development, 398 So.2d 88 (La.App. 3rd Cir. 1981):
"... we do not believe the Court intended to leap to the other extreme and automatically deny recovery to every motorist who strays onto the shoulder and thereafter does not accomplish a safe re-entry back onto the roadway's riding surface. Instead, we feel it our duty to, on a case-by-case basis, focus on the facts and circumstances presented in each case to determine whether the straying motorist breached his duty to drive reasonably."
Our review of the record in this case reveals no evidence to show that the plaintiff did in fact make an attempt to get back on the main travel portion of the highway. The state trooper who investigated the accident did not make a determination or form an opinion regarding the actions of the Merrell car after running onto the shoulder, other than speculating that a spray of gravel indicated the point at which it re-entered the highway. This showed only that it was traveling in a northwesterly direction at that point. The accident report simply stated the reason for the movement of the vehicle as "out of control, not passing."
The occupants of the truck with which the plaintiff collided noticed nothing untoward about the plaintiff's automobile as it approached, until they observed that the driver had apparently lost control.
The bulk of the evidence regarding Mr. Merrell's loss of control indicates that it was due to his hitting the rut and that he did not lose control in attempting to regain the main travel portion of the highway. The plaintiff testified that due to the rain, he was driving cautiously with his headlights and windshield wipers on, at about 40 miles per hour. He stated this was the speed at which he always drove in heavy rains. This testimony was corroborated by the two passengers, except that they could not testify as to his speed. All the witnesses testified that it seemed he did not have time to bring the car under control and try to get back on the highway after the sudden bump or jolt when the tire left the pavement and before the collision occurred. The plaintiff himself had no clear memory of what occurred after he felt the wheel leave the pavement except that he tried to hold the vehicle straight, but never regained sufficient control to maneuver the car at all.
We conclude the trial court's determination of plaintiff's freedom from negligence is not clearly wrong under the evidence presented at trial.

QUANTUM
The defendant contends that the trial court erred in awarding the plaintiff excessive general damages of $200,000 for pain, suffering, disfigurement and disability, and *666 in granting an excessive award for future loss of wages in the amount of $368,000.
Our law provides in LSA-C.C. Article 1934 that in the assessment of general damages, the judge or jury has much discretion. The standard of appellate review for such trial court determinations was set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977):
"We do reemphazise, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award."
The Supreme Court further elaborated on this principle in Reck v. Stevens, 373 So.2d 498 (La.1979), wherein it stated:
"Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion', La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case."
The plaintiff's injuries as a result of this accident were quite severe. He was pinned in his automobile with part of the dash around his knees and his right foot trapped for almost two hours. He was apparently conscious during most of this time, attempting to extricate himself and suffering a great deal of pain. The orthopedic surgeon, Dr. T. E. Banks, testified the plaintiff was still conscious upon his arrival at Rapides General Hospital.
His relatively minor injuries consisted of a cerebral concussion, lacerations of the scalp and through the upper lip, injury to his teeth, glass cuts on his abdomen and chest, and lacerations on his hands. The severe injuries were an open fracture of the left femur with bleeding from the thigh, and an obvious deformity of his left foot which was diagnosed as a lateral dislocation of the astragalus (this is the dome-shaped bone on the top of the foot which comes up to form the bottom half of the ankle joint and fits into the cavity formed by the configuration of the lower end of the tibia and fibula).
The fractured femur was treated by inserting a pin through the tibia and placing the entire leg in traction until the open wound on the thigh had healed, in order to avoid the danger of infection. The femur was fractured in two places. In the subsequent operations necessary to repair the fracture, an S-shaped incision approximately 12 inches in length was made in order to insert a Hansen-Street nail into the femur through the medullary canal, from the buttocks to the knee. This injury ultimately healed completely with no further complications.
The crushing of Mr. Merrell's left foot has resulted in permanent disability since the damage to the astragalus was so extensive that Dr. Banks concluded the foot would be better without it. It was therefore left out and the plaintiff's tibia now rests on the os calcaneus (heel bone). This condition is quite painful, and the plaintiff was still using one crutch over a year after the accident because of the pain in his foot. He now has to wear a special rocker-bottom shoe, to aid him in walking. The only thing which can be done to relieve the pain, and the surgical procedure advised by Dr. Banks, is fusion of the tibia with the heel bone, which should eliminate the pain if successful but will leave Mr. Merrell with a stiff ankle. From surgery to rehabilitation would take a period of four to six months.
Dr. Banks testified that without this surgery, which had not been performed at the time of trial, the plaintiff has a 35% disability. *667 With a successful fusion, he would be left with a 25% disability. Mr. Merrell was 21 years old at the time of the accident and 23 at the time of trial. He can no longer enjoy the recreational activities in which he participated before the accident since he has difficulty in running and walking on uneven ground. He has been unable to work since the accident and can now only do some types of light work requiring mostly sitting. Under these circumstances, we discern no abuse of discretion in the trial court's award of $200,000 in general damages.
The trial court utilized the calculations of the economic experts presented by both parties in making its award for past and future loss of wages. The Department does not dispute the award of $16,544 for past loss of wages. However, it argues that the trial court abused its discretion by accepting defendant's expert's calculations of loss of future earnings in the amount of $368,000, but not adopting the complete approach used by this expert to calculate a "net over-all economic loss."
When the trial court determines the amount of damages sustained by a particular tort victim, it is appropriate to consider all pertinent factors discussed by the experts as those factors bear on the probability of that victim's earnings over his work-life expectancy. One of the appropriate factors to be considered in setting damages for impairment of earning capacity is the probability or improbability that the plaintiff would have earned similar amounts during the remainder of his work-life, but for the injury. Moreover, impairment of earning capacity cannot be calculated with mathematical certainty, and sound judicial discretion must be exercised after all proper considerations are weighed. Philippe v. Browning Arms Company, 395 So.2d 310 (La.1980), on rehearing.
The Supreme Court further stated in Philippe:
"[6] In the determination of an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity."
The plaintiff's economic expert, Earl Thames, calculated Mr. Merrell's loss of future earnings based on the assumption that he would never go back to work. He estimated loss of future wages in the sum of $264,900. He did not use an inflation factor, nor a discount, because he estimated these would offset each other.
In contrast, the defendant's expert, Dr. Burford, used the assumption that plaintiff could perform some types of manual labor for wages after July of 1981. He first calculated a total loss of future earnings of $368,000, assuming that the plaintiff never worked again. To reach this figure, he used the minimum wage of $3.35 per hour at the time of the accident in November of 1978, and he calculated 40 hours per week, 52 weeks per year for a total of $6,936 per year. Then he added an 8% per year inflation factor to 1981, the year of the trial, to reach base earnings of $8,090 per year. Using U.S. Bureau of Labor statistics, he estimated a work-life expectancy of 38 years after 1981. Then he calculated annual inflation of 8% and an annual discount of 7% (for interest earned on a lump sum award) the net effect being he compounded a 1% increase for 37 years, resulting in the figure of $368,750. At the end of the 38 years, the entire principal and interest of the fund will be depleted. See Hardy v. State of Louisiana, through Department of Highways, 412 So.2d 208 (La.App. 3rd Cir. 1982), for a detailed analysis of essentially this same method of calculation of loss of future wages.
Defendant's expert, Dr. Burford, made another calculation based on the assumption that plaintiff could perform some manual labor for wages after July of 1981, as testified to by Dr. Banks. In these calculations he again used the base figure of $8,090 earnings in 1981, and again used an 8% annual inflation rate and a 7% annual discount rate, for estimated total actual earnings during the 38 years following 1981 in *668 the sum of $317,000. He then subtracted $317,000 estimated actual earnings by plaintiff from the sum of $368,000 estimated loss of earnings, resulting in an estimate of $51,000 in future loss of earnings. Defendant contends this is the method of computation and the figure which the trial court should have adopted in awarding damages for loss of future wages.
The plaintiff presented the testimony of a vocational rehabilitation expert which established that Mr. Merrell is unlikely to ever have steady employment again, due to the combination of a low level of intellectual ability and his physical disability. Although the plaintiff is a high school graduate, his academic achievement is limited to a third or fourth grade level. The plaintiff's expert, Dr. Galloway, placed him in the mild to moderate range of retardation and stated that he could not be rehabilitated to a higher level because he does not have the scholastic or academic ability. He has further suffered a loss of versatility due to the injury, because he cannot move from one job to another in the same industry. He will be restricted in bending, lifting and climbing and, therefore, disqualified from even moderately strenuous jobs involving manual labor. This expert's opinion was that his chances of employment are quite small since the only type of job available to him in Natchitoches Parish and the surrounding area would be of a light janitorial nature in a service-type business which lacks stability. Even in this type work, he is likely to lose out in terms of competitive employability to someone with all the same characteristics except the disability. Moreover, employers are reluctant to hire a worker with a disability because of the increased likelihood of workmen's compensation claims.
Based on all the evidence, the trial court concluded that the plaintiff is virtually unemployable in the Natchitoches Parish area and very unlikely to ever again secure steady employment. He therefore awarded for future loss of wages the amount which he deemed to have been calculated by the most reasonable method, and which had been based on the assumption that Mr. Merrell will be unable to work again. We find no abuse of discretion in this conclusion.
The Department's final contention is that the trial court's award is excessive because the evidence shows that Mr. Merrell should have undergone the corrective surgery as soon as Dr. Banks found he was ready for it and, had he done so, would have been able to return to work. Thus, the argument goes, his damages would have been minimized and the calculation of net loss of future earnings by the Department's expert was the proper award. This argument is without merit inasmuch as the evidence shows that, even with the surgery, the plaintiff will continue to be disabled from the manual labor for which he is suited. He will still be limited in his ability to bend, lift, climb and walk. Based on the expert testimony, the trial court's conclusions that the corrective surgery would not significantly increase the likelihood of Mr. Merrell's future employment is not manifestly erroneous.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant-appellant.
AFFIRMED.