531 So.2d 506 (1988)
Karl F. ERMERT, III
v.
HARTFORD INSURANCE COMPANY, et al.
No. 88-CA-0106.
Court of Appeal of Louisiana, Fourth Circuit.
July 12, 1988.
On Rehearing August 31, 1988.
Writ Granted November 28, 1988.
*507 Jerald N. Andry and Gilbert V. Andry, III, New Orleans, for appellant.
Steven M. Lozes, Lozes, Cooper & Cambre, Raymond A. Pelleteri, Ward & Clesi, New Orleans, Thomas G. Buck Blue, Williams & Buckley, Joseph S. Palermo, Jr., Bernard, Cassisa, Saporito & Elliott, Metairie, Daniel L. Dysart, Dysart, Sanborn & Tabary, Chalmette, for appellees.
Michael G. Cordes, Linn, Foster, Freedman, Abbott, Webb, Best & Meeks, New Orleans, for appellant/appellee.
Before GULOTTA, C.J., and GARRISON and PLOTKIN, JJ.
PLOTKIN, Judge.
Appellant, Karl F. Ermert III, seeks reversal of the trial court's finding that all the members of a hunting club are not personally liable for injuries he sustained when one of the members shot him in the foot. He also seeks an increase in the amount awarded by the trial court. Appellant/appellee, Hartford Insurance Co., seeks reversal of the trial court's finding that the tortfeasor's company, Nu-Arrow Fence Co., is liable for damages sustained by Ermert in the shooting.

*508 FACTS
We adopt the trial court's well-written and reasoned statement of the facts, as follows:
This case arose out of a shooting accident which occurred early in the morning on November 14, 1982. Plaintiff, Karl F. Ermert, III, was spending the weekend as a guest of Russell Larrieu at a hunting camp located on Bayou Bienvenue near Lake Borgne in the marshlands of St. Bernard Parish, Louisiana. Plaintiff along with Russell Larrieu, Alkaney Cummings, Leon Brumfield, Joseph Caillouette, Robert Bourcq and Kenneth Decareaux were at the hunting camp to participate in the building of duck blinds to be used in the upcoming duck season.
On the morning of the accident, Decareaux saw a nutria outside of the hunting camp and began loading a shotgun for the purpose of shooting the nutria. As defendant Decareaux was exiting the hunting camp with the loaded shotgun, the gun discharged and struck plaintiff in his left foot.
Initially, plaintiff brought suit against Decareaux and his insurer. In his first supplemental and amending petition, plaintiff alleged that Larrieu, Cummings, Brumfield, Caillouette, Bourcq and Decareaux should be held jointly and solidarily liable as defendants because of their alleged joint venture or partnership relationship. Specifically, plaintiff alleged that the hunting camp was owned by the alleged joint venture composed of Larrieu, Decareaux, Cummings, Brumfield, Caillouette and Bourcq. Plaintiff also alleged that Larrieau received annual dues from the other members of the alleged joint venture. Plaintiff further alleged that at the time of the accident, the named defendants were at the camp for the purpose of constructing improvements and were liable to plaintiff for certain acts of negligence which included failure to have rules against the unsafe and hazardous practice of allowing persons in the camp to load weapons in the camp; failure to have rules against the unsafe and hazardous practice of allowing persons in the camp to discharge weapons in the camp; and any and all other acts of negligence.
On February 1, 1985, the Court granted motion for summary judgment and maintained exceptions of no cause of action in favor of all the defendants except Decareaux, the actual tortfeasor in this case. Plaintiff appealed this decision and the Court of Appeal for the Fourth Circuit reversed and remanded the case, stating that there was a "club" and that the conflicting evidence in the record precluded summary judgment:
The evidence shows that there was a "club." Whether the men were part of a juridical entity which is liable for the negligent shooting or for their failure to formulate safety rules is a question of fact. More information on the organization, membership, meeting and club rules could support a finding of negligence. The contradictory record does not support summary judgment.
Ermert v. Hartford Ins. Co., 480 So.2d 999, 1001 (La.App. 4th Cir.1985), writ denied 484 So.2d 672 (La.1986).
Upon remand and at trial on the merits, this Court heard additional evidence and testimony regarding the organization, membership, meetings and club rules. The testimony of defendants indicates that Larrieu entered into a verbal lease on his own behalf on property belonging to Mr. Meraux. The camp building was constructed by Larrieau, Cummings, Brumfield, Caillouette, Decareaux, and Bourcq, all long time friends or acquaintances. Only Larrieu contributed money toward the actual construction. The rest of the men contributed various materials, furniture and/or labor. Larrieu negotiated an oral lease to hunt duck on ponds owned by Dubuchel. This lease was separate from the lease held by Larrieu on the site where the camp was located. Each man paid approximately $52/year in dues which was used in part to cover the annual $120 rental for the ponds.
The remainder of the funds was held by Larrieu and used for necessaries such as replacement of butane, utensils, and *509 pots and pans. The costs of groceries was split equally. Guests wee allowed subject to approval of Larrieu. Each guest was required to pay his own share. The members always checked with Larrieu before going to the camp as they all considered Larrieu to be the owner of the camp.
Written rules were formulated at monthly meetings held in the 1960's when the membership of the association was composed of Larrieu, Brumfield, and Cummings and the camp was in a location different from that of the camp where plaintiff was injured. This earlier camp was destroyed by Hurricane Betsy and another camp was built. This second camp later burned down and the present camp was built at a different location. The rules and regulations were not formulated for the camp where plaintiff was injured but for a different and separate camp which existed approximately twenty years before the subject accident. Although no one voted to abolish the rules, they subsequently "went out of the window" because the membership evolved into a group of men who were friends and got along well together. There were no formal meetings. The men had informal discussions and were generally in agreement about hunting safety matters. In fact, any "rules" regarding hunting safety were simply common sense guidelines to which all hunters, whether experienced or not, should adhere. Common sense dictated that the guns should always to empty while in the camp, loaded only while in the duck blinds, and unloaded prior to leaving the blinds for the camp.

LIABILITY OF THE CLUB AND/OR MEMBERS
On the basis of the above facts, the trial court found that "this group of men constituted a somewhat loose unincorporated association formed solely for recreational and not for business purposes," but concluded that "there is no legislation or jurisprudence in Louisiana that discusses vicarious tort liability of members of unincorporated associations." He then cited the following general agency principles from 7 C.J.S. Association Sections 30 and 32:
While mere membership in an association does not of itself impose liability for the acts of the associates, at least in the absence of participation and knowledge or approval, liability of members of a voluntary, unincorporated association may be established by a public act of the association itself, or by the acts of officers, agents, or members where such acts are known to the membership and actively or passively approved. Liability may also exist if a member set the proceedings in motion, or agreed to a course of action which culminated in the conduct. In other words, a member of an association is liable for illegal acts which he individually commits, participates in, authorizes, or assents to or ratifies.... The mere fact of membership in an association is not of itself sufficient basis for a tort liability of individual members for the wrongful acts or omissions of an association or its agents, and liability may be required to be predicated on participation in the activities of the association or in the tortious conduct.... However, the members are responsible for tortious acts committed by the society where it can fairly be assumed that they were within the scope of the purposes for which the organization was formed, or where they aided or abetted in the commission of the tort, or individually agreed to the course of conduct which culminated in injury.... [A] member may be individually liable for his torts even though the other members are not liable.
The trial court discussed two ancient Louisiana cases cited by plaintiff as authority for holding members of an association liable. Vredenburg v. Behan, 33 La.Ann. 627 (1881); Simmonds v. Southern Rifle Club, 53 La.Ann. 1114, 27 So. 656 (1900). The court distinguished these cases from the case at hand on the basis of the fact the club itself was held liable for the torts of the club itself, not for the acts of one of its members, in the previous cases. The judge then stated:

*510 There is no basis in Louisiana law, either legislative or jurisprudential, on which to hold the association liable for the acts of one member, here Decareaux. The tort committed against Ermert was not done by the association or within the scope of its purposes. The members were there to build duck blinds. The members did not aid in the commission of the tort nor did they agree to the course of conduct. In fact they forbade the use of guns around the camp.
We disagree with that conclusion. The trial court is correct that no Louisiana statutes or cases address the exact question at issue here. However, that fact alone does not preclude courts from considering whether, under the facts of the instant case, liability should flow from the act of the individual club member through the club itself to the other members of the club.
La.C.C.P. art. 738 states as follows:
An unincorporated association has the procedural capacity to be sued in its own name. The members of an unincorporated association may be sued jointly on an obligation of the association and the association may be joined as a defendant in such an action.
Though infrequently interpreted in the case law of this state, the above article does provide a procedural device for suing an unincorporated association, like the hunting club in this case, and for suing the individual members for a tort attributed to the association. Therefore, in the instant case, if there is a basis for holding the hunting club liable for Decareaux's tort, the individual members are legally responsible for the damages caused by the tort.
A review of the caselaw from other jurisdictions indicates that most states adhere to the "general agency principles" for applying liability to members of an unincorporated association as set out in Corpus Juris Secundum, stated above. Many courts which have considered the question have also applied a duty/risk analysis to determine whether the club itself and/or the non-tortfeasor members of the club should be held liable.
For example, in Lyons v. American Legion Post No. 650, 172 Ohio St. 331, 175 N.E.2d 733 (1961), the Ohio Supreme Court differentiated between unincorporated associations organized and functioning for business and commerce reasons from those organized and conducted for fraternal or social purposes on the following basis: the former are controlled by partnership principles, while the latter are controlled by agency principles. Id. 175 N.E.2d at 737. Using those principles, the court held that an action would lie only against those members of the club who authorize or subsequent ratify the injury-causing action. Id.
In a more recent case with factually similar circumstances to the instant case, the Alabama Supreme Court allowed the survivors of a boy killed during a deer hunt to bring suit against the tortfeasor's hunting club. Hall v. Booth, 423 So.2d 184 (Ala. 1982). After analysis of the facts of the case, the court held that the shooting of the boy was the proximate cause of the death, which was also an unforeseeable event that broke the chain which might have extended liability to other members of the unincorporated hunting club, who otherwise might have been negligent in he manner in which they conducted the hunt. Therefore, even though the members were not held liable under the circumstances of the Hall case, the court did allow for the possibility that members of a hunting club could be individually liable for the actions of another member of the club.
Applying the general agency principles and duty/risk analysis outlined above, we hold that the non-tortfeasor members of the hunting club in the instant case should be held liable for the defendant's injuries on the basis of the following findings.
First, the club itself had a duty to the plaintiff to adopt and enforce rules to prevent accidental shootings of members and/or their guests. The evidence adduced at trial indicates that the members of the club depended on the "common sense" of the other members to insure the safety of those at the camp. There was testimony concerning an informal understanding that *511 guns were not to be loaded until the hunters reached the duck blinds and that they were to be unloaded before they left the blinds. However, the evidence is overwhelming that no formal rules had been discussed for many years, certainly not since the camp where this accident occurred had been built.
Second, the testimony concerning the events of the morning in question indicates that Decareaux's actions in attempting to shoot the nutria were within the scope of the purposes for which the organiation was formed. As discussed in Corpus Juris Secundum, members of an unincorporated association are generally held responsible in three situations: (1) where the tortious acts are within the scope of the purposes for which the organization was formed, (2) where they aided or abetted in the commission of the tort and (3) where they individually agreed to the course of conduct which culminated in injury. 7 C.J.S. Association Section 32. The purpose of the club was wholly social. The members of the club went to the camp to hunt and to fraternize with their friends. The tortfeasor in this case was one of the "official" chefs when the club members met at the camp. He testified at trial that he intended to cook the nutria for the group to eat. Obviously, the action was taken for the good of the group as a whole.
Finally, the circumstances indicate that the action was taken with the "passive approval" of the other members of the club who were present at the club at the time the accident occurred. Decareaux testified at trial as follows:
Q When you left the bunkhouse and entered the main camp, was anything going on?
A They were just walking around talking. I remembered Russel waswe had two bunks up against the window facing the bayou and Russel was on one and Karl was on the other. I remember that. And I think Brumfield and Bobby was out on the porch.
Q Did someone on the porch say something to you about the fact that they had seen a nutria.
A Right. Someone, who it was, again, I don't remember, but they said there was a nutria crossing the Bayou Bienvenu.
. . . . .
Q When you heard something about a nutria, did you say anything to Mr. Caillouette or anyone else?
A Yes, sir, I did. I asked Mr. Caillouette if he wanted to cook a nutria.
Q What did he say?
A I think he said yes. I think the reply was yes.
. . . . .
Q And when you all would cook these things up, nutria, coon, prairie chicken, whatever it may be, you fed it to all the people that were there; didn't you?
A Right, sir.
. . . . .
Q Okay. Now, in response to questions having asked you, would you tell the court what you did. And just take us through it, if you will. I'll try not to ask you too many questions. If you will just take us through what you did after that, how you did it.
A Well, when I looked out and I saw the nutria, I went from where I was standing which was on theno, it wasn't the bayou side. It was onwhat side we would saywe'll say facing the camp it would be on the right-hand side. So I went over to the left side and got J.C. Caillouette's shotgun. And then I grabbed some shells and put the shells into thein the chamber. And I walked over to the other door right were Brumfield and Bourcq was and was on the outside. And I was standing right about by the stove and I put the gunthe shell into the chamber and when I pumped it the gun ignited and went off and Karl was standing on my right.
Trial transcript, pages 63-65.
Thus, the uncontroverted evidence is that several other members of the club were present at the time the accidental shooting occurred and apparently no one objected to or tried to prevent Decareaux's actions. Therefore, the other members of the club *512 should be found liable for plaintiff's injuries because they tacitly assented to Decareaux's actions, as well as for the other reasons discussed above.
Although we agree with the trial judge's opinion that the hunting club in question is not a partnership or a joint venture under Louisiana law, we disagree with his conclusion that the club should be found immune from liability under Louisiana's Recreation Statutes, LSA-R.S. 9:2791 and 9:2795. The purpose of the recreation statutes is to grant immunity from liability to landowners who allow their property to be used for recreational purposes. State v. Madere, 352 So.2d 666 (La.1977). (Emphasis added.) The club in question did not own the land where the accident occurred. The land where the camp was located and the land where the duck blinds were being constructed was all owned a third parties. Therefore, by their express terms, the recreation statutes cannot apply in this case.
Although all the other defendants, who were members of the club and present at the camp when the accident occurred, must be held liable for the damages sustained by the plaintiff in this case, that liability should not extend to Alkaney Cummings, who was not present and whose testimony indicates that he had not been a member of the club in question for years. Obviously, since he was not present, the second and third reasons for holding the club members liable stated abovethe act was taken for a group purpose and the members present tacitly approved the act do not apply to him. Further, since the plaintiff failed to prove that Cummings was in fact a member of the club in question and since Cummings himself vigorously disputes the fact, he cannot be held liable for the first reasonthe failure of the club members of formulate rules to protect the safety of persons present on the premises.
For the reasons stated above, the trial court's decision dismissing Caillouette, Bourcq, Brumfield and Larrieu from the suit is reversed and those club members and their insurers are held jointly and solidarily liable with Decareaux for the injuries sustained by plaintiff. The judgment dismissing Cummings is affirmed.

LIABILITY OF NU-ARROW FENCE CO., INC.
The trial judge found that Nu-Arrow Fence Co. was liable for the actions of Decareaux on the basis of the following factual findings:
In the present case, Decareaux was president and majority stockholder in Nu-Arrow Fence Company. He allowed Larrieu to purchase materials for the construction of the camp through Nu-Arrow's account and then reimburse Nu-Arrow. Some of the purchased materials were cut up on a saw owned by Nu-Arrow at its plant. The doors and casings were given to Larrieu at cost. When items were purchased, either employees of Nu-Arrow or Decareaux himself picked up the materials. Nu-Arrow employes brought back old fence boards to Nu-Arrow which were ultimately used at the Larrieu camp.
Purchased items and used boards were loaded by Nu-Arrow employees and transported from the plant to the dock in company owned trucks. On occasion, materials were picked up in Slidell and transported to the dock in these trucks. All gasoline for the transport of materials was charged on Nu-Arrow gas credit cards and paid for solely by Nu-Arrow. Larrieu never paid for any of the expenses involved in the use of the trucks, the Nu-Arrow employee labor, or the use of the company yard. Lumber and used fence boards were supplied for the building of the camp.
Once the camp was built, Decareaux used it to entertain his employees and to promote his business. Decareaux's subjective belief as to not using the camp to promote Nu-Arrow business on the weekend of the accident is irrelevant. Decareaux invited all of the Nu-Arrow employees to the camp either at the same time or a few at a time. Decareaux paid for their expenses out of the Nu-Arrow petty cash fund. He had sold fences to *513 the majority of the members of the association. He derived other business through references given by the regular members of the hunting group. He invited the company sponsored softball team to the camp because several employees were on the team. The softball team advertised for the company. There was conflicting testimony as to whether Decareaux paid for the expenses of the team.
He also invited to the camp people who had purchased fences from Nu-Arrow such a Tom Dempsey and Jerry Gagliano. Decareaux testified that some of the guests were invited because they were relatives or friends. However, the relatives were employees and the friends were customers. Turkington, Nu-Arrow's vice-president, admitted that even when he is off on his own personal entertainment, he talks to people who buy fences from Nu-Arrow. Turkington revealed that an executive such as Decareaux was expected to seize any opportunity to further the business regardless of time and place.
Nu-Arrow and Decareaux increased their business and therefore benefited from the hunting club. Nu-Arrow both derived economic benefit and provided economic assistance to the hunting camp. Nu-Arrow contributed its materials, resources and employees' time for the improvements at the camp. Nu-Arrow used the camp for company functions. Nu-Arrow directly benefited from the existence of the camp by the sales made to members of the camp and their acquaintances. As a result of the intertwining of the benefits to Nu-Arrow with Decareaux's activities at the camp, the court must hold that Decareaux was within the scope of his employment at the time of the accident. Decareaux had so thoroughly blended his business with his pleasure that the two became inseparable. Decareaux is therefore an additional insured within the terms of the Hartford policy.
Even if we accept all of the above factual findings as true, we do not agree that any of them provides a legal basis for holding Nu-Arrow Fence Co. liable for the particular action performed by Decareaux which caused plaintiff's injuries.
In reaching the above conclusion, the trial court relied on Austen v. Sherwood, 446 So.2d 274 (La.1984), where the state supreme court held a newspaper liable for injuries caused by its arts/entertainment writer while he was driving to New Orleans to attend the Jazz Festival. The court stated as follows:
Sherwood was performing a function for which he was employed. During the trip to New Orleans, Sherwood was acting within the scope of this employment as arts editor at the [newspaper].... Sherwood's business and personal pursuits were intermingled. While he attended the concert for entertainment, he was simultaneously obtaining information which furthered his employer's business interests.... Sherwood's trip was primarily "employment rooted." When an employee's tortious conduct is closely related to his employment duties, the employer is liable for resulting damages.
Id. at 279.
The instant case is easily distinguishable. At the time of the accident, Decareaux was not performing a function for which he was employed by Nu-Arrow. Although in the past, Decareaux's business and personal pursuits may have been intermingled when he was present at the camp, that was not true on the weekend in question. In fact, there is nothing in the record to connect Nu-Arrow to Decareaux's accidental shooting of the plaintiff. Additionally, the record is clear that Decareaux's primary purpose for the trip to the camp on the weekend in question was not "employment rooted," but was purely to build duck blinds, a recreational pursuit.
La.C.C. art. 2320 provides as follows:
Masters and employers are answerable for the damages occasioned by their servants and overseers, in the exercise of the functions in which they are employed....
In a leading case interpreting the above decision, LeBrane v. Lewis, 292 So.2d 216 *514 (La.1974), the court based the liability of the employer on the following conclusion:
[T]he tortious conduct of the supervisor was so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests.
In the instant case, the exact opposite could be said. Decareaux's tortious conduct was not closely connected to his employment duties and thus cannot be regarded as a risk of harm fairly attributable to Nu-Arrow. Rather, the conduct was "motivated by purely personal considerations entirely extraneous to the employer's interests."
This finding is supported by previous decisions of this court. In Cain v. Doe, 378 So.2d 549 (La.App. 4th Cir.1979), we stated as follows:
The social policy underlying imposition of vicarious liability contemplates charging the employer with responsibility for damages caused by the employee in the exercise of the functions in which the employee was hired.... However, the purpose of the policy is not served when (as in the present case) the employee's tortious conduct occurs long after he has completed his employment duties and the employee is engaged in an activity which is not shown in any manner to be related to the service of the employer or to the furthering of the employer's interest.
Id. at 550. (Citations omitted.)
The plaintiff has failed to show that Decareaux's activities in the instant case were related in any manner to service of Nu-Arrow Fence Co. or to the furtherance of the company's interests. Neither his previous use of the camp to entertain guests and customers nor his contributions to the building of the camp affect the fact that his actions at the time of the accident were not related to his employment at Nu-Arrow. Absent some connection between the tortfeasor's conduct at the time the injury-causing activity occurred and his employment, the company cannot be held liable for the tortfeasor's actions. No such connection has been shown.
For the above and foregoing reasons, the trial judge's decision holding Nu-Arrow Fence Co. liable for Decareaux's tortious actions and finding that Decareaux was an additional insured under Nu-Arrow's policy with Hartford Insurance Co. is reversed. The plaintiff's suit against Hartford is dismissed.

SUFFICIENCY OF DAMAGES
The trial court made the following damage awards to the plaintiff:

Medical Expenses
Past and Future $ 50,000
Loss of Earnings
and Earning Capacity $305,000
General Damages $240,000
 ________
TOTAL..............................$595,000

None of the parties contest the validity of the award for medical expenses.
The plaintiff complains that the past and future wage damages and the general damages awarded by the trial court are insufficient to compensate him for his actual losses. Although the trial court's reasons for judgment do not explain the method by which he calculated damages, our review of the evidence and the expert testimony reveals that the trial court's award was not manifestly erroneous.
Past and Future Wage Losses
The opinions of the two experts who testified at trial differed in a number of aspects. The major difference was in the proper method for calculation of the appropriate wage basisthe plaintiff's expert, Dr. Melville Wolfson, testified that plaintiff's wage losses should be calculated on the basis of the salary he had earned prior to the accident in 1982, while the defendant's expert, Dr. Ken J. Boudreaux, testified that the proper salary basis was the average of the plaintiff's salary for the four years prior to the accident. Additionally, Dr. Wolfson allowed the plaintiff a credit for fringe benefits the employer would have paid in his calculation of both past and future wage losses. In calculating future losses, Dr. Wolfson allowed for *515 a six per cent wage increase for the plaintiff's 15.26 years of work life expectancy. The future wage figure was discounted by Dr. Wolfson at a rate of 7.5 per cent. Dr. Wolfson also reduced the future wage entitlement figure by the amount the plaintiff could earn at minimum wage over his remaining work life expectancy. The defendant's expert was less generous to the plaintiff. Using the described method, Dr. Wolfson calculated plaintiff's total past and future wage losses at $595,005. Dr. Boudreaux calculated the total wage losses at $231,368.
Neither expert's method for calculating the past and future wage losses was totally correct. "Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury." Folse v. Fakouri, 371 So.2d 1120, 1123 (La.1979). The base salary to be used when the plaintiff is employed in an industry where work is sporadic is the average of the plaintiff's salary during the years immediately prior to the accident, as indicated by the defendant's expert. Normally, only three years of salaries are used to determine the average; however, in this case, since using the fourth year, 1979, was approved by the defendant's expert and is beneficial to the plaintiff, we will adopt $17,115 figure advocated by the defendant as the original base salary. From there, Dr. Wolfson's computations on cross-examination, allowing for fringe benefits which would have been paid by the employer, a six per cent annual wage increase and a 7.5 per cent discount rate, are proper. Entitlement to future wages must also be reduced by the minimum wage equivalent which the evidence indicates the plaintiff should be able to earn during the remainder of his work life expectancy, as Dr. Wolfson advocated. Using the average base salary above and these principles, Dr. Wolfson testified that Ermert would be entitled to the following amounts:

Past Wage Losses
Actual loss $ 82,325.00
Lost fringe benefits 18,572.00
 ___________
Total Past Losses $100,897.00
Future Lost Wages
Actual losses
(Present value) $239,453.00
Lost fringe benefits 54,135.00
 ___________
Total Future Losses $293,588.00
Less minimum wage
equivalent 89,039.00
 ___________
Total Future Entitlement $204,549.00
 ___________
TOTAL LOST PAST AND FUTURE
WAGES $305,446.00

The trial judge awarded the plaintiff $305,000. Although his reasons for judgment do not explain how he reached that amount, our calculations, based on the testimony of the plaintiff's own expert, yield essentially the same amount. Therefore, we find that the past and future wage loss damage award made by the trial judge is not manifestly erroneous. Accordingly, we affirm the award.
General Damages
Plaintiff also challenges the general damages award of $240,000 set by the trial court, saying comparable cases indicate the award is too low for the damages he suffered. The court has reviewed the briefs submitted by all parties, as well as other comparable caselaw, and discovered general damage awards for major injury to one foot set as low as $100,000 in Noel v. Geosource, Inc., 585 F.Supp. 487 (E.D.La. 1984) and as high as $300,000 in Welton v. Falcon, 341 So.2d 564 (La.App. 4th Cir. 1976). Most of the awards, including those cited by the plaintiff, were in the $200,000 range set by the trial court. See Merrell v. State, Through Dept. of Transportation & Development, 415 So.2d 660 (La.App. 3d Cir.) ($200,000); Garrick v. Washington Parish, 440 So.2d 787 (La.App. 1st Cir. 1983). Since we can find no manifest error in the trial judge's decision, we affirm the $200,000 general damage award.

CONCLUSION
For the reasons explained above, the judgment of the trial court is reversed and there will be judgment in favor of Karl F. Ermert III and against member of the unincorporated association and their insurers Kenneth Decareaux, Robert Bourcq, Joseph Caillouette, State Farm Fire and Casualty Co.; Leon Brumfield, Allstate Insurance Co.; and Russell Larrieu, Sentry Insurance *516 Co.jointly and in solido in the sum of $595,000, from the date of judgment, plus interest, costs and expenses.
The trial court judgment is also reversed as the Nu-Arrow Fence Co., Inc. and Hartford Accident and Indemnity Co., dismissing them as defendants, without costs.
The judgment is affirmed, dismissing Alkaney Cummings and South Carolina Insurance Co.
REVERSED IN PART. AFFIRMED IN PART. RENDERED.

ON APPLICATION FOR REHEARING
PER CURIAM.
We have reconsidered the contentions of several members of the club that they should be immune from liability for the injuries incurred by Ermert under Louisiana's Recreation Statutes, LSA-R.S. 9:2791 and 9:2795. We reject those contentions, but for reasons different from those originally given.
The purpose of the recreation statutes is "to encourage the opening of lands for recreational purposes." Keelen v. State of Louisiana, Department of Culture, Recreation and Tourism, 463 So.2d 1287, 1289 (La.1985). In order for owners of property to be entitled to statutory immunity the property where the injury occurred must be "an undeveloped, nonresidential rural or semi-rural land area." Ratcliff v. Town of Mandeville, 502 So.2d 566, 567 (La.1987). The record in the instant case reveals that the property in question had been developed. Additionally, the camp where the accident occurred was not open to the public, as contemplated by the Recreation Statutes. The members of the club are not entitled to the benefits of the immunity for the reasons stated herein.
We affirm our original opinion in all other respects.
AMENDED AND AFFIRMED.